**E-FILED**
Friday, 27 July, 2007 02:52:08 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THE GSI GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-3011 |
| | ) | |
| SUKUP MANUFACTURING CO., | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Plaintiff GSI Group, Inc.'s (GSI) Converted Motion for Partial Summary Judgment Against Sukup's Antitrust Counterclaims (d/e 174 and 227) (GSI Converted Motion). Defendant Sukup Manufacturing Company (Sukup) filed amended counterclaims against GSI alleging monopolization and attempted monopolization in violation of the Sherman Antitrust Act. 15 U.S.C. § 2. Defendant Sukup Manufacturing Co.'s First Amended Answer, Affirmative Defenses, and Counterclaims and Demand for Jury Trial in Response to Plaintiff's Third Amended Complaint (d/e 161), Sixth Counterclaim & Seventh Counterclaim. GSI moved to dismiss the counterclaims, but the

1

Motion relied on matters outside the record.  <u>Motion to Dismiss (d/e 174)</u>, <u>Attached Exhibits</u>.  The Court informed the parties that the Court would treat the Motion as a motion for summary judgment.  <u>Text Order entered March 6, 2007</u>; <u>Fed. R. Civ. P</u>. 12(b)(6) & 56.  The Court gave the parties time to file additional materials to support or oppose the Motion.  <u>Text Order entered March 6, 2007</u>.  The parties have done so.  Upon review of the material submitted, the Court rules that the Converted Motion is allowed.  Sukup has failed to present evidence that GSI has market power in the relevant market, except to the extent that its patents give it market power.  Sukup fails to present evidence that GSI's market power based on its patents violates § 2 of the Sherman Antitrust Act.  As a result of this decision, GSI's Motion and Memorandum to Dismiss Sukup's Antitrust Counterclaims as Being Barred by the Statute of Limitations (d/e 171), and GSI's Motion for Leave to File a Response to Sukup's Surreply to GSI's Motion to Dismiss Sukup's Antitrust Counterclaims as Being Barred by the Statute of Limitations (d/e 304) are moot.

STATEMENT OF FACTS

GSI and Sukup build and sell large capacity tower grain dryers.  These dryers are large cylinders eighteen to twenty-four feet in diameter.  The

dryer cylinder stands up vertically.   The dryers have inner and outer perforated walls that are approximately twelve inches apart.   The dryers have a heat source in the center of the cylinder.   The grain is fed into the top of the cylinder and flows down in the space between the inner and outer walls.   The heated air from the heat source in the center of the dryer cylinder passes through the perforated walls and dries the grain as it flows down between the inner and outer walls.   The dried grain at the bottom is then unloaded from the dryer.

GSI holds U.S. Patent 6,076,276 ('276 Patent) for a sweep device that unloads the grain at the bottom of the dryer.   Converted Motion, Exhibit 10, Patent 6,076,276.   The '276 Patent was actually issued to a company called ffi, Inc. (ffi).   GSI acquired ffi, and its patents, in 2001.   In 2004, Sukup started building and selling tower grain dryers.   GSI claims that Sukup's tower dryers infringe on the '276 Patent.   Sukup has counterclaimed that GSI is illegally monopolizing or attempting to monopolize the market for large capacity tower dryers.

Sukup presents evidence that GSI controls between seventy to ninety

-seven percent of the market for large capacity tower dryers.[1]  GSI officials and former officials have testified that GSI and Sukup are now the only sellers in this market.[2]  GSI acknowledges that it enjoys a strong reputation for performance, dependability, and serviceability in the large capacity tower dryer market.  <u>Sukup's Response in Opposition to GSI's Motion for Summary Judgment Regarding Sukup's Antitrust Counterclaims (d/e 239) (Sukup Response)</u>, Exhibit 11, <u>Declaration of George Geoffrey Griffin (Griffin Declaration)</u>, ¶ 14.

GSI holds some thirty-one patents.  <u>Sukup Response</u>, Exhibit 16, <u>Declaration of Pamela Miller</u>, ¶ 5.  In addition to the sweep unloader, GSI's patents include a hopper system for unloading grain from the tower dryers.  GSI does not use the hopper system for the large capacity dryers at this time because the sweep system is more effective.  GSI refuses to license any of its patents on the tower dryers.  <u>Sukup Response</u>, Exhibit 1, <u>Report of Mark Hoffman</u>, at 28.

---

[1]GSI does not dispute Sukup's market definition for purposes of this Motion only.  <u>Converted Motion</u>, at 11, n. 2.

[2]GSI disputes Sukup's evidence on this, and many other points.  <u>See</u> <u>Converted Motion</u>, at 16-17, ¶¶ 33-35, and materials cited therein.  The Court, however, must analyze the evidence in the light most favorable to Sukup for purposes of the Converted Motion.

In March of 1996, prior to filing the patent application for the sweep unloader, ffi sold a tower dryer to Archer Daniels Midland Company (ADM).  The dryer sold had an auger unloader, which was the standard mechanism used by ffi at that time.  Additional Brief of Sukup Manufacturing Co. Concerning GSI's Motion at Docket Entry 174 (d/e 272 & 273) (Sukup Additional Response), Exhibit 19, Deposition of Paul Peterson, at 130.  The order form, however, contained a hand-written note that stated the dryer would include a prototype sweep unloader per the agreement of the parties.  Sukup Additional Response, Exhibit 23, Order Form dated March 5, 1996.  Ffi secured ADM's agreement to install the sweep unloader in order to test the mechanism.  Paul Peterson of ffi supervised the installation and testing of the sweep unloader.  Paul Peterson Deposition, at 133-36.

The auger unloader system was shipped to the site at State Line, Indiana, where the dryer was constructed.  The auger system, however, was never installed.  Instead, a sweep unloader was shipped separately in the fall of 1996 and installed.  Once the sweep unloader was operational, the auger system was returned to ffi.  Paul Peterson Deposition, at 135-36.  Paul Peterson stated that no dollar amount was assigned to the prototype

unloader, but the installation of the prototype was agreed upon by the parties as a basis for the purchase.  Id., at 131.  Once the auger unloader system was returned to ffi, however, ADM received a $6,600 prototype discount.  Peterson stated in his deposition, "[W]e were going to discount them the auger unload once the--after we installed the prototype.  We gave them a discount for allowing us to do prototype work."  Id., at 135-36.  ADM incurred no additional charge for the sweep unloader system.  Id., at 136.

Ffi completed the testing on the State Line, Indiana, dryer in late 1996 or early 1997.  Ffi made changes to the design of the sweep unloader based on these tests.  Sukup Additional Response, Exhibit 18, Deposition of Wesley Peterson, at 95.  ADM also used the dryer in its business, and so, used the sweep unloader as part of its operations.  ADM was not limited in its used of the sweep unloader and was not subject to any confidentiality limitations regarding disclosure of information about the sweep unloader.  Wesley Peterson Deposition, at 72.

Ffi filed a provisional patent application for the sweep unloader on July 30, 1997.  Ffi subsequently filed four non-provisional patent applications thereafter.  Converted Motion, Exhibits 8-11, Patent

<u>Applications</u>.  The applications named three ffi employees as the inventors of the sweep unloader, Terry McKenzie, Paul Peterson, and Wesley Peterson.  <u>Sukup Additional Response</u>, Exhibit 20, <u>Declaration and Power of Attorney (Declaration and Power of Attorney)</u>.  The applications did not disclose to the Patent Office the fact that ffi had installed a sweep unloader in the tower dryer that it sold to ADM in March 1996 (hereinafter referred to as the State Line Transaction).

The ffi patent applications included a copy of a brochure of another grain dryer that had a sweep unloader.  A company called Butler Manufacturing marketed a line of grain dryers under the name Kan-Sun.  At least some of the Kan-Sun dryers had a sweep system for unloading grain.  Some of the inventors went to see a Kan-Sun dryer as part of their work in developing the ffi sweep unloader.  The inventors submitted a Kan-Sun brochure to the Patent Office as part of each patent application.  The brochure was all of the material in their possession that related to a Kan-Sun dryer with a sweep unloader.  <u>Sukup Additional Response</u>, Exhibit 18, <u>McKenzie Deposition</u>, at 39.

In filing the patent applications, the three inventors stated in the patent applications that "[w]e believe we are the original, first and joint

inventors of the subject matter which is claimed and for which a patent is sought . . . ."  <u>Declaration and Power of Attorney</u>.  Paul Peterson stated that the sweep unloader was an improvement on the existing sweep or paddle systems because the system they designed worked in larger dryers.  <u>Paul Peterson Deposition</u>, at 20.

In 2006, Sukup deposed the three inventors and ffi's patent attorney Paul Maginot who represented ffi in the prosecution of the '276 Patent applications.  In the depositions, Paul Peterson, Wesley Peterson, and Maginot were asked to compare Claim 9 in the '276 Patent with the sweep unloader depicted in Kan-Sun brochure.  Claim 9 states:

A floor sweep assembly for a grain dryer, comprising:

a framework which is rotatable around a central axis, wherein said framework included (I) a first primary support member which extends radially outwardly relative to said central axis, and (ii) a second primary support member which extends radially outwardly relative to said central axis; and

a first wiper positioned relative to said framework such that, when said floor sweep assembly is viewed in a plan view, said framework and said first wiper define (I) a first primary intersection of said first wiper and said first primary support member, and (ii) a second primary intersection of said first wiper and said second primary support member.

'276 Patent, Claim 9.  Maginot stated that the patent prosecution was nine years earlier and he could not render such an opinion without reviewing the documents more thoroughly.  Maginot was given time over a lunch break to review the documents, but still responded that he would need more time to conduct a more thorough review before rendering an opinion.  Sukup Additional Response, Exhibit 21, Deposition of Paul Maginot, at 47-69. Paul Peterson was asked, "What was your understanding at the time you signed declaration of the new aspect of claim 9 relative to the Kan-Sun dryer?"  Paul Peterson Deposition, at 166.  He responded, "I don't know the answer to that question."  Id.  Wesley Peterson stated that he would need to review the engineering support to explain the distinction between Claim 9 and the Kan-Sun dryer.  Sukup Additional Response, Exhibit 22, Deposition of Wesley Peterson, at 110.

On December 19, 2006, GSI filed with the Patent Office a Reissue Patent Application for Patent No. 6,076,276.  Sukup Response, Exhibit 14, Reissue Patent Application Transmittal (Reissue Application).  GSI declared, as part of the Reissue Application, "I verily believe the original patent to be wholly or partly inoperative or invalid, for the reasons described below . . . by reason of other errors."  Reissue Application, at page

20 of 46, <u>Reissue Application Declaration by the Assignee (Reissue Declaration)</u>.  The Reissue Application then deleted Claims 9 and 15 from the '276 Patent, but incorporated the language of Claim 9 into Claims 10 and 11, and incorporated the language of Claim 15 into Claim 16.  Claim 9 is quoted above.  Claim 15 states:

> The floor sweep assembly of claim 9, further comprising:
>
> a second wiper positioned relative to said framework such that, when said floor sweep assembly is viewed in said plan view, said framework and said second wiper define a third primary intersection of said second wiper and said second primary support member.

<u>'276 Patent</u>, Claim 15.

> The Reissue Declaration states:
>
> At least one error upon which reissue is based is described as follows:
>
> Applicant's attorney erroneously removed the claim for priority to U.S. Provisional Patent Application No. 60/054,171, filed July 30, 1997 during prosecution of the application.

<u>Id.</u>, at page 21 of 46.  Subsequent to filing the Reissue Application in December 2006, GSI has continued to allege that Sukup is infringing on the '276 Patent.  <u>Third Amended Complaint</u>, Count I.

Sukup also presents evidence of other activities by GSI.  Sukup has

submitted evidence that GSI's prices for large capacity grain dryers have changed over time.  Prior to purchasing ffi, GSI charged $15,000 to $20,000 less than ffi for comparable dryers.  After acquiring ffi, GSI increased its prices nearly to the same level previously charged by ffi before the acquisition.  After Sukup entered the market in 2004, GSI again dropped its prices below Sukup's prices.  Griffin Declaration, ¶¶ 23-24. Customers friendly to GSI have solicited price information from Sukup and passed this information on to GSI.  Sukup Response, Exhibit 3, Deposition of Gary Kinder, at 100-12, 124-29, 131-39.  Thus, GSI has become aware of Sukup's pricing structure.

In 2005, GSI's attorneys sent letters to some of Sukup's tower dryer customers asserting that GSI believed that Sukup was infringing on GSI's patents and that the purchasers may also be infringing.  Sukup Response, Exhibit 6, Letters of William Cunningham dated August 1, 2005, and September 8, 2005.  GSI issued a press release announcing commencement of this lawsuit against Sukup, stating that the suit alleges that Sukup is infringing on GSI's patents.  Sukup Response, Exhibit 9, GSI Press Release dated September 7, 2005.  Sukup also presents hearsay evidence that GSI has terminated relationships with two construction contractors who

provided construction services to Sukup.  One of these contractors erects tower dryers.  Another builds jacks used in the erection process.  <u>Griffin Declaration</u>, at ¶¶ 29-30.  GSI employees have also expressed hatred for Sukup and a desire to destroy Sukup.  <u>Sukup Response</u>, Exhibit 3, Kinder Deposition, at 151-54, 186; and Exhibit 7, <u>Email from Kinder to David Morrison dated July 19, 2006</u>.

## ANALYSIS

At summary judgment, GSI must present evidence that demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to Sukup.  Any doubt as to the existence of a genuine issue for trial must be resolved against GSI.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Once GSI has met its burden, Sukup must present evidence to show that issues of fact remain with respect to an issue essential to its case, and on which it will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

To establish a violation of the Sherman Act, § 2 for monopolization, Sukup must present evidence on each of the following elements: (1) a

defined relevant market exists; (2) GSI possesses monopoly power in the relevant market; and (3) GSI willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  Endsley v. City of Chicago, 230 F.3d 276, 282 (7th Cir. 2000).  In this case, GSI does not challenge Sukup's definition of the relevant market for purposes of the Converted Motion.  The market is large capacity tower grain dryers.  The issue is whether Sukup has presented evidence that GSI has market power and if so, whether GSI willfully acquired that power.  Market power means the ability to control the supply of the product in the market and thereby to control the price.  See Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1336 (7th Cir. 1986).

Sukup relies heavily on GSI's market share to demonstrate market power.  This Court has, in the past, stated that market share can sometimes be sufficient to prove market power.  State of Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co., 730 F.Supp. 826, 902 (C.D. Ill. 1990). The Seventh Circuit has explained, however, that market share is not always sufficient to establish market power at summary judgment.  Evidence of large market share will be sufficient if "the definition of the market builds

13

in a conclusion that there are no significant additional sources of supply and no substitutes from the consumers' perspective." Ball Memorial Hospital, Inc., 784 F.2d at 1336.  Apart from GSI's patents, Sukup has presented no evidence of any factor within the relevant market, such as GSI's cost structure or any regulatory structure, that would preclude other sources of supply or substitutes from a consumer's prospective.  Sukup presents no evidence concerning whether other companies could enter the market for large capacity tower dryers if GSI attempted to restrict supply or raise prices significantly.[3]

Sukup presents evidence that GSI holds patents, but market power from the use of patents is the consequence of a superior product or business acumen, not illegal monopolization (subject to the exceptions discussed below).  See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816 (1945); Brunswick Corp. v. Riegel

---

[3]Sukup has submitted the opinions of George Geoffrey Griffin and Randall J. Park concerning the market for large grain dryers.  Sukup Response, Exhibits 10 and 11, Declaration of Randall J. Park and Declaration of George Geoffrey Griffin.  Griffin and Park were not properly disclosed as experts and so cannot render expert opinions in this case.  Fed. R. Civ. P. 26(a)(2).  Furthermore, Griffin's experience as a salesman does not qualify him to render opinions about market concentration and barriers to entry.  Park only renders opinions concerning whether smaller dryers are acceptable substitutes for large capacity dryers.  He does not render any opinions about whether any barriers to entry exist in the large capacity dryer market.

Textile Corp., 752 F.2d 261, 264-65 (7th Cir. 1984).  Thus, in this case, evidence of market share alone is not sufficient to demonstrate that GSI has market power for purposes of summary judgment.  Sukup must present some other evidence that indicates that GSI has market power.

Sukup argues that several factors show that GSI has market power.  None is persuasive.  Sukup argues first that GSI is wrongfully suing Sukup for infringing patents that it knows are invalid.  Sukup argues that this tactic demonstrates GSI's improper use of invalid patents to exercise power over the market.  Patent claims can be a basis for an antitrust claim if the patent was procured or enforced by fraud.  Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346 (Fed.Cir. 2007); Brunswick Corp., 752 F.2d at 264-65.[4] Ffi procured these patents, not GSI.  Thus, to show that the patents were secured by fraud, Sukup must present clear and convincing evidence that ffi: (1) made a false representation or deliberate omission of fact to the patent examiner that was material to patentability; (2) with the specific intent to deceive the patent examiner; (3) on which the patent examiner justifiably

_____

[4]The law of the Federal Circuit controls the issue of whether a patent holder's prosecution of a patent strips a patentee of its immunity from the antitrust laws.  The law of the Seventh Circuit controls all other antitrust issues related to Sukup's antitrust counterclaims.  Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1067-68 (Fed.Cir. 1998).

relied; and (4) but for the misrepresentation or omission, the patent would not have been granted.  C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1365 (Fed.Cir. 1998); see Nobelpharma AB, 141 F.3d at 1073.  Evidence that ffi engaged in some form of inequitable conduct, such as a failure to reference a piece of prior art, is not sufficient to show the requisite fraudulent intent.  Id., at 1071.

Sukup has presented no evidence that ffi had any intent to deceive or to defraud.  Sukup complains that ffi only submitted one Kan-Sun brochure with its sweep unloader patent applications.   Sukup argues that ffi intentionally omitted other information of the prior art used in the sweep unloader in the Kan-Sun line of dryers to deceive the patent examiner.  The uncontroverted evidence, however, shows that ffi submitted all of the documentation in its possession about the Kan-Sun line of dryers.  Such evidence does not show an intentional fraudulent omission or misrepresentation.  Ffi was only obligated to submit to the Patent Office the relevant information known to it about prior art; it was not obligated to conduct a prior-art search.  Frazier v. Roessel Cine Photo Tech, Inc., 417 F.3d 1230, 1238 (Fed.Cir. 2005).  There simply is no evidence that ffi hid information about the Kan-Sun line of dryers.

Sukup argues that ffi intentionally hid the sale of the sweep unloader in the State Line Transaction in order to deceive the Patent Office. Offering an invention for commercial sale for a year before filing a patent application will bar the patentability of the invention. 35 U.S.C. § 102(b). See Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 65 (1998). Experimental use of a product, however, is not a commercial sale that bars patentability. EZ Dock v. Schafer Systems, Inc., 276 F.3d 1347, 1352 (Fed.Cir. 2002). A commercial sale is shown if the sale occurred after the design of the product was reduced to practice. Id. Sukup argues that the State Line Transaction was a commercial sale of the sweep unloader more than a year before the July 30, 1997, application. Sukup argues that ffi fraudulently omitted this fact from the '276 Patent applications to deceive the patent examiner.

Sukup does not present any evidence that ffi had any fraudulent intent to hide a commercial sale of the sweep unloader from the Patent Office. Sukup has presented no evidence that any of the inventors believed the State Line Transaction was a commercial sale. Paul Peterson, Wesley Peterson and Terry McKenzie all stated that the sweep unloader was installed as a prototype for testing. Sukup presents no evidence that the inventors were recklessly or wilfully ignoring the facts before them in

believing that the State Line Transaction was an experiment.  The evidence surrounding the State Line Transaction indicates that it was an experiment. ADM ordered a standard dryer with an auger system, but the parties agreed that a prototype sweep unloader would be installed.  The dryer was shipped with the standard auger unloader.  Once the sweep unloader was installed, the auger unloader was returned to ffi, and ADM received a discount to reflect that return.  ADM was not charged anything for the sweep unloader. ADM, thus, did not pay for the prototype.  See Kolmes v. World Fibers Corp., 107 F.3d 1534, 1540 (Fed.Cir. 1997) (one consideration for determining whether a sale is a commercial sale is whether the transaction was primarily for profit rather than for experimental uses).  Sukup's own sales manager George Geoffrey Griffin stated that ADM knew that the State Line Transaction was a test installation.  GSI's Reply in Support of its Converted Motion for Partial Summary Judgment Against Sukup's Antitrust Counterclaims (d/e 294), Exhibit 17, Deposition of George Geoffrey Griffin, at 53-54.  ADM used the prototype in its business, but such use does not negate the fact that this was an experimental use.  Such use is consistent with testing the sweep unloader under conditions that would ensure that the device would work properly.  Id.  Ffi ran tests on the prototype and

modified the design as a result of the testing.  This fact indicates ffi did not complete the final design of the sweep unloader that was reduced to practice until after this testing, which was within a year of the initial July 30, 1997, patent application.  Since the inventors reasonably believed that the State Line Transaction was an experiment rather than a commercial sale, the omission of the transaction from the patent application was not fraudulent.

Last, Sukup argues that the inventors on the ffi patents and ffi's patent attorney knew that Claims 9 and 15 were not original, but only copies of the prior art in the Kan-Sun line of dryers; as such, they intentionally lied in the patent application by stating, under oath, that the sweep unloader in the ffi patent application was their original invention. Sukup has no evidence that any of the inventors or the patent attorney believed that Claims 9 and 15 were not original.  Sukup's lawyers asked the inventors and the lawyer nine years after the patent application to look at a Kan-Sun brochure and distinguish the Kan-Sun unloader from the two Claims.  Paul Peterson said that he did not know the answer to the question of what his understanding was nine years earlier about the new aspect of Claim 9 relative to the Kan-Sun line of dryers.  The lawyer, Maginot, said that he would have to make a thorough review before rendering an opinion.

Wesley Peterson said that he would have to review the engineering support. These are, at best, ambiguous responses to questions; none of these answers provide clear and convincing evidence of any knowledge of a deficiency in Claims 9 and 15, or any specific intent to deceive. Sukup fails to present any evidence that the ffi patents were procured by fraud.

Sukup also argues that GSI is fraudulently enforcing patent claims that it knows are invalid. To prevail on this theory, Sukup must present clear and convincing evidence that GSI knew that ffi procured the '276 Patent by fraud. Nobelpharma AB, 141 F.3d at 1069. There is no evidence about GSI's knowledge of ffi's actions to procure its patents. GSI knew of the State Line Transaction, but, as explained above, Sukup fails to show that the use of the prototype at State Line affected the validity of ffi's patents. Thus, there is no reason GSI would know that such testing affected the validity of ffi's patents, or rendered the '276 Patent fraudulent.

Sukup complains that GSI is continuing to pursue its claims of infringement of Claims 9 and 15 of the '276 Patent before this Court, even though it has withdrawn those Claims in the Reissue Application filed with the Patent Office. Sukup argues that GSI is thereby pursuing a patent infringement claim in bad faith. Sukup argues that such a bad faith lawsuit

20

strips GSI of its antitrust immunity.  See Handgards Inc. v. Ethicon, Inc., 743 F.2d 1282, 1288 (9th Cir. 1984).  The evidence presented does not show that GSI is currently pursuing alleged infringement of Claims 9 and 15.  The Third Amended Complaint alleges infringement of the '276 Patent; it does not allege infringement of Claims 9 and 15 of the '276 Patent. Sukup has not shown that GSI is pursuing patent claims that it knows to be invalid.

Sukup also argues that GSI is engaging in sham litigation.  The doctrine regarding sham litigation is an exception to the doctrine, known as the Noerr/Pennington doctrine, that the exercise of the right to petition the government for redress is immune from the antitrust liability.  Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 59 (1993); United Mine Workers of America v. Pennington, 381 U.S. 657, 669 (1965); Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961).  The sham litigation exception to the Noerr/Pennington doctrine strips antitrust immunity from the party that engages in the sham use of a petition for redress.

To show that GSI is engaged in sham litigation, Sukup must present evidence that this lawsuit is objectively baseless and that GSI has the

subjective intent to use the lawsuit only as an anticompetitive tool. Professional Real Estate, 508 U.S. at 60-61.  GSI alleges that Sukup infringed on the '276 Patent.  Sukup claims this is objectively baseless because it argues that the '276 Patent was procured by fraud and because GSI has withdrawn Claims 9 and 15 from that Patent.  As explained above, Sukup has failed to present evidence that the '276 Patent was procured by fraud.  Further, the allegations in the Third Amended Complaint are not objectively baseless; the Third Amended Complaint does not allege that Sukup infringed on Claims 9 and 15 of the '276 Patent; rather, it alleges that Sukup infringed on the '276 Patent.  Alleging infringement of the '276 Patent as a whole is not objectively baseless.  The sham exception to the Noerr/Pennington doctrine does not apply.  Sukup has failed to present evidence that GSI is improperly attempting to exercise market power through fraudulent procurement or enforcement of its patents.

Sukup also argues that GSI has the power to charge supracompetitive prices.  To establish this theory, Sukup must present evidence that GSI can lower prices below its costs to drive competitors out of the market, and then raise prices to a supracompetitive level to recoup any losses that resulted from the price cuts.  Brooke Group Ltd. v. Brown & Williamson Tobacco

Corp., 509 U.S. 209, 222-23 (1993).  Sukup has no evidence that GSI has

the power to do this.  The only evidence is a declaration from a Sukup sales

manager, George Geoffrey Griffin.  Griffin states that GSI lowered its prices

when it had competitors.  Griffin, however, presents no evidence to show

that the price was below GSI's cost.[5]  In addition, Griffin states that after

GSI acquired ffi, GSI raised prices almost to the level that ffi charged before

the acquisition.  Thus, GSI did not raise the price above the price that had

been charged by their former competitor.  There is no evidence that GSI

raised the price to a supracompetitive level.  Thus, Griffin's declaration does

not provide evidence that GSI had the power to charge supracompetitive

prices.

Sukup argues that GSI controls limited resources and so is able to

restrict entry into the market.  The only evidence is Griffin's hearsay

evidence that two contractors told him that GSI stopped doing business

with them because they started doing business with Sukup.  Hearsay is not

competent to oppose a motion for summary judgment.  Fed. R. Civ. P.

56(e).  Even if the evidence was competent, the fact that GSI elected to stop

---

[5]Griffin is not disclosed as an expert witness and so cannot render expert opinions about GSI's cost structure or its pricing structure.  Griffin, however, does not opine about whether the GSI's prices were below its costs.

doing business with these two contractors does not show control of limited resources.  There is no evidence on the number of contractors available.  There is no evidence of the ability or inability of new contractors to enter the market.  There is no evidence that any contractor refused to do business with Sukup because of GSI's decision not to do business with these two contractors.  Without more, this anecdotal information about two contractors does not show control over the supply of construction contractors to erect tower grain dryers.

Sukup argues that GSI secured price quotations from Sukup by inducing friendly customers to make sham requests for price quotes.  Sukup cites no authority for why this is illegal.  Sukup argues that securing these quotes shows an intent to monopolize.  Securing this information shows an intent to discover a competitor's price, and thus, an intent to compete.  This hardly shows market power or an intent to monopolize.

Sukup also cites statements by GSI personnel that they hated Sukup and desired to take down Sukup.  The aggressive attitude of GSI personnel toward Sukup does not show impermissible intent; rather, their attitude shows an intent to compete.  See Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 273 (7th Cir. 1981).  The Sherman Act is designed to promote

competition, not protect competitors.  <u>Brunswick Corp. V. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488 (1977) (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320 (1962).  Given the lack of evidence of market power, GSI is entitled to summary judgment on Sukup's monopolization counterclaim.

GSI is also entitled to summary judgment on Sukup's attempted monopolization claim.  To establish attempt to monopolize, Sukup must present evidence: (1) of the relevant market; (2) that GSI has the specific intent to monopolize; (3) that one or more acts by GSI were wrongful and were in furtherance of the intent to monopolize; (4) there is a dangerous probability that GSI will succeed eventually in monopolizing the market; and (5) damages.  <u>Indiana Grocery v. Super Valu Stores, Inc.</u>, 864 F.2d 1409, 1413 (7th Cir. 1989).  Here, the lack of any evidence of market power means that Sukup has no evidence of a dangerous probability that GSI will succeed.   GSI is entitled to summary judgment on the attempted monopolization claim.

THEREFORE, GSI Group, Inc.'s Converted Motion for Partial Summary Judgment Against Sukup's Antitrust Counterclaims (d/e 174 and 227) is ALLOWED.  Partial summary judgment is entered in favor of GSI

Group, Inc., and against Sukup Manufacturing Company on the Sixth and Seventh Counterclaims in Defendant Sukup Manufacturing Co.'s First Amended Answer, Affirmative Defenses, and Counterclaims and Demand for Jury Trial in Response to Plaintiff's Third Amended Complaint (d/e 161). GSI's Motion and Memorandum to Dismiss Sukup's Antitrust Counterclaims as Being Barred by the Statute of Limitations (d/e 171) is DENIED as moot. GSI's Motion for Leave to File a Response to Sukup's Surreply to GSI's Motion to Dismiss Sukup's Antitrust Counterclaims as Being Barred by the Statute of Limitations (d/e 304) is DENIED as moot. IT IS THEREFORE SO ORDERED.

ENTER:   July 27, 2007.

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE