# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THE GSI GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3011 |
| | ) | |
| SUKUP MANUFACTURING CO., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on the following partial summary judgment motions:

Plaintiff GSI Group, Inc.'s (GSI) Motion for Partial Summary Judgment that GSI's Bin Door Patent (U.S. Patent No. 5,135,271) is Valid as to 35 U.S.C. §§ 101, 102, and 112 (d/e 400) (Motion 400);

GSI's Motion for Partial Summary Judgment Against Sukup's Inequitable Conduct Affirmative Defense and Counterclaim, and for a Declaration of Enforceability as to GSI's Bin Door Patent (d/e 420) (Motion 420);

Defendant Sukup Manufacturing Co.'s (Sukup) Alternative Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,135,271 (d/e 454) (Motion 454); and

Sukup's Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 5,135,271 (d/e 442) (Motion 442).

1

For the reasons set forth below:  Motion 400 is allowed; Motions 420 and 442 are allowed in part; and Motion 454 is denied.

<u>STATEMENT OF FACTS</u>

I.     <u>THE PATENT and PRIOR ART</u>

United States Patent No. 5,135,271 (271 Patent) describes an improved latching mechanism and pin design for grain storage bin doors. Grain storage bins are cylindrical structures made of corrugated metal designed to hold large amounts of grain.  When the bins are full, the grain presses outward against the walls of the bin.  This pressure is called "hoop stress."  The bins have doors on the sides to allow access to the interior of the bins when the bins are empty.  The problem is how to construct a door that can withstand the hoop stress when the bin is full and still open and close easily when the bin is empty.  <u>Sukup Unsealed Summary Judgment Exhibits (d/e 461) (Sukup Unsealed Exhibits)</u>, Exhibit 21, <u>U.S. Patent No. 5,135,271 (271 Patent)</u>, <u>Background of Invention</u>.

Prior designs used metal pins pointing inward toward the interior of the bin, placed in rows on the vertical sides of the door frame (also referred to as the door jamb).  The door was divided into several horizontal door panels (also referred to as cover members).  The door panels were hinged to

swing into the bin to open.  The door panels also had holes on each side that would fit over the pins located on the door frame.  When the door was shut, the pins would hold the door panels in place when the grain was placed into the bin.  The pins effectively integrated the door into the wall so that the door panels would bear the hoop stress as part of the bin wall. Id.  Grain bins using this design were sold under the names of Brock and Stormor.  The Brock design was patented by a man named Grossman. Sukup Unsealed Exhibits, Exhibit 20, U.S. Patent No. 4,913,478.

A problem arose from the prior designs because the hoop stress would cause the pins to press up and stick against the side of the holes in the doors.  When the grain bins were then emptied, the door panels would stick on the pins and become difficult to open.  The 271 Patent describes a latching mechanism that solves this problem by using a latch that creates leverage when opening the door to force the door off the pins.  The 271 Patent also describes an improved pin that better withstands the shear force applied by the bin walls and the door panel as they pull against the pin under the weight of the grain when the bin is full.

A.     <u>The Latch</u>

The abstract to the 271 Patent states:

In order to help disengage the cover member from the adjacent bin wall, the latching apparatus includes cam means for providing a mechanical advantage to force the cover member out of engagement with the pins and thereby permit the cover member to open with reduced effort.

<u>271 Patent</u>, <u>Abstract</u>.

The detailed drawings of the preferred embodiment of the invention show a grain bin door divided into three horizontal door panels, one above the other.  The 271 Patent drawings of the door are set forth in Figures 1 and 2, of the 271 Patent, reproduced in Appendix A to this Opinion.  Each door panel is hinged to swing into the bin when opened.  Each door panel has a series of holes lined up vertically on each side to fit over the row of pins on each side of the door jamb.  Each door panel has two latch bars on the outside of the door panel.  The two latch bars run horizontally, one above the other, for the width of the door panel.

At either end, the latch bar is connected to the cover member by a capital "L" shaped hook with the latch bar attached to the top of the L shape and the door panel attached to the base of the L shape by a bolt that acts as a pivot point.  A detailed drawing of the L shaped hook is set forth

in Figure 7 of the 271 Patent, reproduced in Appendix B.

When the door panel is closed, the L shaped hook fits over a rod or bolt that sticks out from the door frame that acts as a catch. The door panel is latched by forcing the L shaped hook over the catch so that the L shape is upside down and the catch is caught in the corner formed by the L shape.

The base of the L shape is flat on the bottom, but the top of the base of the L shape is curved. The curved shape runs next to the catch when the latch is opened and closed. The curve is designed so that the catch is closer to the pivot point on the door panel when the latch is closed and farther from the pivot point when the latch is opened. The curve acts as a cam when the door is opened and closed. When the latch is closed, the catch runs along the curve of the cam and pulls the pivot point on the door panel closer to the catch. This forces the door panel closer to the catch on the exterior of the door frame. The effect of this is to force the door panel onto the pins and shut. When the latch is opened, the catch runs along the cam surface and forces the pivot point on the door panel farther away. This forces the door panel away from the catch on the door frame and into the empty bin. The effect is to push the door panel off the pins on the inside of the door frame, allowing it to swing open into the empty bin.

A lever with a cam surfaced end had been used in other contexts.  In 1956, a man named Oswald patented a fastener that used a lever with a cam to open casement windows.  <u>Sukup Unsealed Exhibits</u>, Exhibit 18, <u>U.S. Patent 2,767,008 (Oswald Patent)</u>.  The drawings from the Oswald Patent are reproduced in Appendix C.  The drawings showed a pin protruding out of the side of a window frame and lever attached to the window sash.  The casement window was hinged on the side opposite the fastener.  The lever consisted of a body that was generally round with one flat side.  A handle protruded out from the body.  The body was attached to the side of the window sash and could be rotated around the screw by raising and lowering the handle.  The body of the fastener also had a curved channel cut into it that the pin would slide into.  When the handle was lowered, the curved sides of the channel acted as a cam surface to force the pin toward the frame to close the window.  When the handle was raised, the curved channel forced the pin away from the frame to allow the window to be opened.  The Oswald Patent stated:

> [W]hen the fastener handle 4*b* is raised the cam surface 4*d*, acting against the projecting portion of the keeper pin 5, will serve to forcibly start the opening of the sash and this action is made doubly effective by the relief of the cam surface 4*d* at its inner end which causes the shoulder formed by the relief to

suddenly strike the keeper pin and separate the sash from the frame in event they are stuck together with varnish or paint.

Id., at 2.[1]

The grain bins in use at the time GSI submitted the 271 Patent application, however, did not use cam openers.  The Stormor door used a latch that consisted of two flat pieces of metal.  Between the two pieces of metal was a cam mechanism operated by a handle that protruded from one side of the latching device.  A drawing of the latch is set forth in Appendix D.  One piece of metal was attached to a hinge that was attached to the door panel.  The end of the other piece of metal was bent up to form a hook edge.  The protruding handle operated the cam mechanism to move the piece of metal with the hook edge back and forth.  Another flat piece of metal was attached to the door jamb.  The end of this piece of metal on the door jamb was also bent to form a hook edge.  To close the door panel, the two hook edges would be interlocked.  The handle would then be turned to pull the door panel shut.  To open, the handle would be turned to release the interlocked hook edges.  Once released, the door could be opened;

---

[1]The numbers that appear in the text of quotations from the various patents refer to reference numbers on the corresponding drawings reproduced in the Appendices to this Opinion.

however, the latch did not apply any force on the door panel to force the panel open.

The Grossman/Brock bin used an L shaped handle attached to the door panel. A copy of the drawings from the Grossman Patent are reproduced in Appendix E. The L shaped handle hooked over a pin that protruded from the door jamb. To close the door panel, the handle was forced down over the pin, which pulled the door panel shut. The L shaped handle, however, was not attached to the door with a cam surface. Thus, lifting the handle allowed the door panel to be opened, but did not apply any force on the door panel to force the panel off the pins. The cam action in the 271 Patent latch provided force to release the stuck pins.

B.    <u>The Pin</u>

The 271 Patent also described an improved pin design. The 271 Patent Abstract stated that the 271 Patent disclosed an "improved pin structure." <u>Id.</u> The detailed drawings in the 271 Patent also showed the pin. Those drawings are set forth in Figures 4 and 8 in the 271 Patent, reproduced in Appendix F.

The pin was fastened to the door frame by a bolt. The bolt passed through the pin and was secured by a nut on the top of the pin. The

portion of the pin that protruded into the bin was tapered.  The portion of

the pin that was next to the wall of the bin door frame had a shoulder with

a diameter slightly smaller than the rest of the pin.  This shoulder fit into

the hole in the wall of the bin door frame so that the wall of the hole in the

door frame abutted the pin rather than the bolt that fastened the pin to the

wall.  This design kept the door frame from pressing directly against the bolt

when the hoop stresses from a full bin were pushing against the wall.

Otherwise, the pressure from the side of the wall pressing against the bolt

would tend to shear off the bolt more easily.  The detailed description of the

preferred embodiment of the 271 Patent stated:

> Pin 38 is comprised of a threaded bolt 76 which extends through a cap bar or washer 78, and through an enlarged hole 80 in door jamb 18 which is substantially larger than the diameter of bolt 76.  A load transfer pin member 82 is secured in place on bolt 76 and the bolt is preloaded or tensioned by a threaded nut 84.  Specifically, nut 84 is tightened on bolt 76 to a pre-determined torque level thereby to preload the bolt in tension and to tightly draw the base of pin member 82 and cap bar 78 into firm frictional engagement with jamb 18 held therebetween.  In this manner, loads between the jamb 18 and the cover members are substantially transferred by the frictional engagement of the pin member and the cap bar with jamb 18, and not by bolt 76 bearing against the edge of enlarged hole 80. It will be appreciated that, in this manner, bolt 76 is loaded only in tension due to its preload and the bolt is not subjected to substantial shear.  This had the effect of increasing the load-carrying capability of improved pin means 34, 38 of the present

invention.

> Pin member 82 includes a generally cylindrical body portion 86 and an inwardly extending tapered portion 88. The diameter of cylindrical body portion 86 is only slightly less than the diameter of bore 36 to provide a snug fit between body portion 86 and bore 36. The diameter of the portion of bolt 76 which passes through hole 80 in door jamb 18 is substantially less than that of hole 80 so that the shear forces, as heretofore described, exerted between storage structure jamb 18 and cover member 24 will not act to shear bolt 76.

271 Patent, at 5. The 271 Patent also stated that the interior of the pin could be threaded so that the bolt could be screwed into the pin, which would eliminate the need for the nut on the end. Id.

The Grossman/Brock design used the head of the bolt as the pin on the interior of the door jamb. The Stormor design used a cap/nut as the pin on the interior of the jamb. A drawing of the two designs is set forth in Appendix G. Under either of these designs, the side of the hole in the door frame contacted the bolt directly and, thus, applied hoop stresses, or shear forces (or loads), directly on the bolt rather than the pin.

II.   DEVELOPMENT OF THE 271 PATENT

GSI assigned Ronald Bestwick to the task of designing an improved bin cover door. Bestwick previously worked for Stormor as chief engineer. In that capacity, Bestwick designed grain bins for Stormor. Sukup Sealed

Exhibits, Exhibit 242, Excerpts of Deposition of Ronald Bestwick, at 17-18.

Bestwick had a bachelor's degree in agricultural engineering.  Bestwick first

started on improving the pin design.  Bestwick added a shoulder to the pin.

He considered this an important feature of his invention.  The shoulder was

the portion of the pin with the smaller diameter that fit into the hole in the

door jamb.  By having the side of the door jamb press against the shoulder

of the pin, the shear forces were absorbed by the shoulder of the pin instead

of the bolt.  See Sukup Sealed Summary Judgment Exhibits (d/e 460)

(Sukup Sealed Exhibits), Exhibit 111, Excerpts of Deposition of Ronald

Bestwick (Bestwick Deposition), at 26-27, 36-37.  After developing the pin,

Bestwick developed the handle with the cam surface to force the door panels

off the pins.  The first prototypes of the new door were completed in early

1990.  Id., at 36.

     GSI began testing the new designs in 1990.  Bestwick tested the

design and a prototype at the GSI facility in early 1990.  On April 12, 1990,

and May 17, 1990, the design was tested to see if it would be able to handle

the hoop stresses that would occur in normal use.  These tests were

conducted at the University of Illinois by German Gurfinkel, a structural

engineer.  Gurfinkel tested a light weight design, intended for grain bins up

to 27 feet in diameter, and a heavy weight design, intended for grain bins up to 65 feet in diameter. Both were put under stress until they failed. In both cases, the design failed at points beyond the hoop stress expected under normal use. Thus, the design could withstand the stresses that could be expected in normal use. These tests did not test the efficacy of the new handle design for opening and closing the cover members. On May 25, 1990, Gurfinkel produced a report of the test results. Sukup Sealed Exhibits, Exhibit 153, Second Progress Report; Bestwick Deposition, at 52-55.

GSI also installed a grain bin door at the Vogel Popcorn facility in Mattoon, Illinois, in April 1990. Bestwick said the door was installed at Vogel Popcorn to test the door. Bestwick Deposition, at 37-38. GSI asked for permission to install the door in an existing bin. GSI did not charge Vogel Popcorn for the door. No evidence indicates that GSI required Vogel Popcorn to sign any confidentiality agreements regarding the door. The door installed was hand-made. Bestwick supervised the installation of the door and instructed Vogel Popcorn personnel on the proper operation of the door. Id., at 37-51.

GSI selected the Vogel Popcorn facility because the door would be

opened and closed more often.  A grain bin door generally is opened and closed when the bin is empty in order to clean the bin.  Usually, a bin is emptied only once a year.  The Vogel Popcorn bin, however, was filled and emptied every two months or so.  Thus, at Vogel Popcorn, the door would be opened and closed more often and GSI could see more quickly how the door performed under several uses.  Bestwick and other GSI personnel inspected the door to see how it was operating.  These inspections continued for several months until Vogel Popcorn had completed three to four cycles of closing the door, filling and emptying the bin, and opening the door.  Id., at 42-43.  The door worked successfully.  GSI did not make any material changes to the design of the door as a result of these tests.  Id.  The door has remained in use at the Vogel Popcorn facility without any changes.  Id., at 42.

GSI filed its patent application for the 271 Patent to the Patent and Trademark Office (PTO) on June 14, 1991.  GSI included information on the Grossman Patent in its application.  GSI also included sales brochures from Stormor and from Brock.  Sukup Unsealed Exhibits, Exhibit 22, Excerpts from the 271 Patent file history (271 History).  GSI made the following comment regarding the Stormor brochure: "On page 4 of the

Stormor brochure, there is disclosed some pin structure; however, the latching system and pin structure claimed in the instant application is not disclosed or suggested." 271 History, Information Disclosure Statement, p. 2.  The Stormor brochure stated the following about the Stormor door:

> Durable Construction – These all-galvanized steel doors are set in a corrugated heavy steel frame.  The frame matches the corrugation of the sidewall sheets for tight bolting and a permanent weather seal.
>
> Easy Access – The new design of these doors permits easy access to the bin, with no cross bars or support members to hinder movement through the door opening.

271 History, Stormor Brochure, at 4.

In approving the 271 Patent application, the Patent Inspector considered both the Grossman and Oswald Patents.  The Patent Examiner stated:

> The prior art does not suggest the recited combination of integrating means and forcing means, in the environment as claimed.  Although the patent Grossman discloses the general environment and Oswald discloses a latch with a forcing cam edge 4d, there is no suggestion of combining them in the particular environment, wherein the separation is more than mere opening the closure, but includes separation of the integrating means.

271 History, Notice of Allowability.  The Patent Examiner, however, did not consider the Brock and Stormor sales brochures because they were

undated.  The 271 Patent was ultimately approved and issued on August 4, 1992.  271 Patent, at 1.

III.   THE SUKUP BIN DOOR

Sukup started marketing its grain bin door in 2001.  The door used two hinged panels with pins and holes like GSI's door and the prior art. Sukup used a pin and separate bolt like the 271 Patent.  The pin had a shoulder that fit into the hole in the bin wall door frame.  Sukup Sealed Exhibits, Exhibit 55, Engineering Drawing of Sukup First Generation Pin. A copy of Exhibit 55 is attached as Appendix H.  The bolt passed through the pin so that only the pin touched the sides of the door panel and door jamb.  The pin also had a tapered end that faced into the bin.

After this suit was filed, Sukup modified its pin twice.  Sukup Unsealed Exhibits, Exhibit 48, Declaration of Charles E. Sukup (Charles Sukup Declaration), ¶¶ 74, 81-83, 85-88, 89-92.  The second generation pin no longer used a separate pin and bolt.  Sukup Seal Exhibits, Exhibit 128, Engineering Drawing of Sukup Second Generation Pin.  Rather, a threaded end was added to the end of the pin that went into the door jamb so that the threaded end would extend to the outside of the door jamb when the pin was put in place.  A copy of Exhibit 128 is attached as Appendix I.  The

15

second generation pin also reduced the amount of taper on the end that extended into the interior of the bin.  The third generation pin used the same one-piece design with the threaded end, but reduced the taper further on the end that extended into the bin.  Sukup Sealed Exhibits, Exhibit 127, Engineering Drawing of Third Generation Pin.  A copy of Exhibit 127 is attached as Appendix J.  Sukup currently uses only its third generation pin in its grain bin doors.  Charles Sukup Declaration, ¶ 92.

Each door panel of the Sukup bin door had two handles on it.  Charles Sukup Declaration, ¶¶ 76-77.  Each handle (Handle) was connected to the door panel with a bracket (Pivot Bracket) that allowed the Handle to slide back and forth laterally several inches, and also to rotate freely for approximately 180 degrees.  The end of each Handle that extended from the Pivot Bracket toward the outer edge of each door panel (Hook End) was bent at an angle with respect to the portion of the Handle that passed through the Pivot Bracket.[2]

The other end of each Handle extended toward the interior portion of

---

[2]The description of the Sukup door Handle and its operation is based on the Court's inspection of the Sukup door presented as an exhibit at the Markman hearing. GSI objects to Sukup Exhibit 1, a purported example of the Sukup door, because Sukup did not make the exhibit available to GSI.  See e.g., GSI Opposition to Sukup's Motion 442 (d/e 524), at 4-5.  Neither party objected to the Sukup door produced at the Markman hearing.

the door panel from the Pivot Bracket (Handle End).  The Handle End was generally "U" shaped.  The Handle End extended approximately ten inches toward the center of the panel, then was bent at a 90 degree angle, then extended another ten inches approximately, and then bent at a 90 degree angle again, and then extended another ten inches approximately (the Gripping Portion), back toward the outer edge of the panel.  A picture of the Sukup door Handle is set forth in Appendix K.

To close the panel, the operator would slide the Handle toward the outer edge of the panel so that the Hook End would engage a bracket on the side of the door frame.  The operator would then rotate the Handle from the top of the door panel to the bottom using the Gripping Portion of the Handle.  The rotation of the Hook End would push the bent portion of the Hook End against the bracket on the side of the door frame and force the panel closed over the pins.  To open the panel, a person would rotate the Handle from the bottom of the panel to the top of the panel.  The rotation of the Hook End would then push against the bracket in the door frame to force the door panel to be released from the pins.  The operator would then slide each Handle toward the center of each panel to pull each Hook End out of each bracket on the door frame and open the panel.

The Gripping Portion of the Handle was designed to remain two to three inches off the panel when the Handle was placed into either the opened or closed position.  In this way, the person operating the door would not smash his hands against the door panel when opening or closing the door.  Sukup referred to this raised part of the Gripping Portion as the "knuckle saver feature."  <u>Defendant's Sealed Exhibits</u>, Exhibit 101, <u>Deposition of John Hanig</u>, at 30-31.

## ANALYSIS

GSI claims that Sukup's grain bin door infringes on claims 1, 9, and 14 of the 271 Patent.  Those claims state:

> 1.    An improved latching apparatus for releasably securing a cover means over an access opening in a bulk storage structure, said bulk storage structure including integrating means for engaging said cover means when said cover means is in a closed position to pass hoop stresses placed upon said storage structure through said cover means, said latching apparatus including latch means associated with said cover means and pivotable between a locking position and an unlocking position, the improvement comprising:
>
> > said latching apparatus including means for forcing said cover means out of engagement with said integrating means as said latch means is pivoted from said locking position toward said unlocking position.
>
> . . . .

18

9.     A latching apparatus for releasably securing a cover member over an access opening in a bulk storage structure which structurally integrates the cover member into the storage structure for improving the structural integrity of the storage structure, said latching apparatus comprising:

> integrating means on said bulk storage structure for releasably and retainably engaging said cover member to integrate said cover member with storage structure when said cover member is in a closed position to thereby transmit forces exerted on said storage structure through said cover member;
>
> latch means, pivotally connected to said cover member;
>
> catch means on said storage structure adjacent said access opening for engaging said latch means and locking said over member in a closed position; and
>
> said latch means including cam means for abutting a portion of said storage structure after said latch means is pivoted out of locking engagement with said catch means to force said cover member to release from said integrating means on said storage structure, to thereby permit said cover member to move toward an open position and allow said access opening to be fully opened.

. . . .

14.    An improved latching apparatus for releasably securing a cover member to removably close an access opening in a bulk storage structure, said cover member being removably integratable into said storage structure to improve the structural integrity of the storage structure, said latching apparatus comprising pin engaging bores formed on an abutting surface of said cover member; pins attached to said storage structure for

19

releasably engaging said bores, hinge means attached to said cover member and to said storage structure for hingedly connecting said cover member to said storage structure; pivot receptacle means attached to said cover member for pivotally attaching latch bar means to said cover member; said latch bar means being operationally attached to said pivot receptacle means for providing a mechanical advantage in closing said cover member over said access opening; and latch protuberant means mounted on edge of said access opening for engaging said latch bar means when closing said cover member over said access opening and for retaining said cover member thereover; the improvement comprising:

said pins are each comprised of a threaded bolt passing through a hole in said storage structure and a pin member positioned around said bolt such that said pin member is tightly engaged with a portion of the inside surface of said storage structure;

said pin member having a generally cylindrical body portion and an inwardly extending tapered nose portion;

the diameter of said cylindrical body portion being only slightly less than the diameter of a respective one of said bores to provide a snug fit between said body portion and said respective one of said bores; and

the diameter of said bolt being less than the diameter of said hole in said storage structure to help relieve said bolt from shear forces exerted between said storage structure and said cover member.

271 Patent, at 6, 7.

In the Markman Opinion, the Court construed several portions of the

271 Patent, including the following phrases in Claim 1 and Claim 9:

Claim 1:

> said bulk storage structure including integrating means for engaging said cover means when said cover means is in a closed position to pass hoop stresses placed upon said storage structure through said cover means.

Claim 9:

> integrating means on said bulk storage structure for releasably and retainably engaging said cover member to integrate said cover member with said storage structure when said cover member is in a closed position to thereby transmit forces exerted on said storage structure through said cover member.

The Court construed both of these phrases to mean:

> A grain storage bin with protuberances or pins that are in vertical rows on both sides of the interior of the grain bin door frame which pins fit snugly into bores or holes on the cover member when the cover member is closed and hold the cover member in place, and equivalents of that structure.

Opinion entered September 27, 2006 (d/e 99) (Markman Opinion), at 9, 10, 12.

> The Court also construed the following phrase in Claim 14:

> said latch bar means being operationally attached to said pivot receptacle means for providing a mechanical advantage in closing said cover member over said access opening;

The Court construed the phrase to mean:

A bar with a fastener attached to a pivot point on the cover member, which fastener has: (1) a handle bar that acts as a lever, and (2) a rotating piece that creates a mechanical advantage as it moves along the catch on the door frame to pull the cover member closed as the lever handle bar is moved from the unlocked to the locked position, and equivalents of that structure.

Id., at 17-18.

The Court determined that the following language of Claim 14 did not need construction:

said pins are each comprised of a threaded bolt passing through a hole in said storage structure and a pin member positioned around said bolt such that said pin member is tightly engaged with a portion of the inside surface of said storage structure; said pin member having a generally cylindrical body portion and an inwardly extending tapered nose portion; the diameter of said cylindrical body portion being only slightly less than the diameter of a respective one of said bores to provide a snug fit between said body portion and said respective one of said bores; and the diameter of said bolt being less than the diameter of said hole in said storage structure to help relieve said bolt from shear forces exerted between said storage structure and said cover member.

Id., at 19-20.

GSI seeks partial summary judgment to establish that the 271 Patent is valid under §§ 101, 102, and 112 of the Patent Act. 35 U.S.C. §§ 101, 102, & 112. Sukup seeks partial summary judgment that the 271 Patent is invalid. Sukup has also asserted an affirmative defense and counterclaim

alleging inequitable conduct by GSI in prosecuting the 271 Patent.  GSI seeks partial summary judgment on this affirmative defense and counterclaim.  Sukup seeks partial summary judgment that it is not infringing on the 271 Patent.

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party.  Any doubt as to the existence of a genuine issue for trial must be resolved against the movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once a movant has met its burden, the non-moving party must present evidence to show that issues of fact remain with respect to an issue essential to its case, and on which it will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The evidence shows that the 271 Patent is valid under the requirements of §§ 101, 102, and 112, and that GSI did not engage in any inequitable conduct in the prosecution of the 271 Patent.  35 U.S.C. §§ 101, 102, 112.  Issues of fact may exist regarding whether the 271 Patent

meets the requirements for validity under § 103 of the Patent Act.  35 U.S.C. § 103.[3]  In addition, issues of fact exist regarding whether GSI engaged in inequitable conduct in its representations to the PTO regarding the Stormor cap/nut and bolt design.  Thus, the ultimate validity of the 271 Patent is left for trial.  Should the 271 Patent be found to be valid, the evidence also shows that Sukup's second and third generation pins do not literally infringe on the pin structure described in Claim 14 of the 271 Patent.  Beyond that, however, issues of fact exist regarding whether Sukup's grain bin door infringes on the 271 Patent.  The Court will address the validity of the 271 Patent, Sukup's claims of inequitable conduct, and then infringement.

I.    VALIDITY OF 271 PATENT

    A.    Section 102 Public Use by GSI

The 271 Patent has been issued and is presumed valid.  35 U.S.C. § 282.  Sukup has the burden to present clear and convincing evidence to overcome that presumption.  EZ Dock v. Schafer Systems, Inc., 276 F.3d 1347, 1351 (Fed.Cir. 2002).  Sukup first argues that it has presented clear

---

[3]GSI did not seek summary judgment on whether the 271 Patent met the requirements of § 103.  Motion 400, at 1, n.1.

and convincing evidence that the 271 Patent is not valid because the invention was in public use more than one year before the date that GSI filed its patent application. An invention cannot be patented if it was in public use more than a year before the patent application is filed. 35 U.S.C. §102.[4] GSI filed its patent application on June 14, 1991. The Critical Date, thus, is June 14, 1990. Sukup argues that the installation of the bin door in the Vogel Popcorn bin in April 1990, constituted a public use before the Critical Date. GSI argues that the door was installed in the Vogel Popcorn bin for experimental purposes to test the door under field conditions.

Sukup has the burden to present clear and convincing evidence that the invention in the 271 Patent was in public use before the Critical Date. Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 737 (Fed.Cir. 2002); EZ Dock, 276 F.3d at 1351. A public use includes a use by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor; provided however, an experimental use is not a

---

[4]Sukup does not argue that the 271 Patent is invalid under § 101. Section 101 requires the subject of a patent to be a, "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Sukup does not dispute that the 271 Patent covers a subject that meets this definition.

public use.  Netscape Communications Corp. v. Konrad, 295 F.3d 1315, 1320 (Fed.Cir. 2002).   Since GSI has asserted that the use was an experimental use, it must present evidence to support that position.  Sukup argues that GSI must present convincing evidence of experimental use. Sukup is incorrect; GSI must present evidence that would prevent Sukup from meeting its burden of proof.  Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 1306, 1316 (Fed.Cir. 2005).  The ultimate burden of proof remains on Sukup to show a public use before the Critical Date by clear and convincing evidence.  EZ Dock, 276 F.3d at 1351-52.

The only evidence on this issue is the recollections of GSI employees. Their testimony establishes that the door was installed with the permission of Vogel Popcorn.  Vogel Popcorn did not pay for the door and no evidence indicates that Vogel Popcorn signed any confidentiality agreements regarding the use of the door.  GSI employees supervised the installation of the door and instructed Vogel Popcorn employees on its use.   GSI employees inspected the door over the next several months, past the Critical Date.  GSI employees were satisfied with the operation of the door as designed and did not make any material changes to the design as a result of the tests.  GSI also tested the door in the laboratory at the University of

26

Illinois.  Those tests were completed in May 1990.  Those tests only tested the ability of the door to bear the hoop stresses of the filled bins, but did not test the new opening and closing mechanism.

Sukup does not provide clear and convincing evidence that the Vogel Popcorn installation was a public use.  Sukup has presented prima facie evidence of a public use: Vogel Popcorn had control of the door without any limitations or secrecy restrictions.  The remaining evidence, however, shows that the installation was for experimental purposes, and so prevents Sukup from meeting its burden to show public use by clear and convincing evidence.  Lisle Corp., 398 F.3d at 1316.  GSI only installed one door.  The door was essentially hand-made.  The hand-made door was retrofitted into an existing bin.  The inventor supervised the installation and instructed Vogel Popcorn personnel on the proper operation of the door.  GSI personnel then inspected the door regularly for at least the next three months to see how it was functioning.  The evidence indicates that the use was experimental.  See e.g., EZ Dock, 276 F.3d at 1352-54 (sale of one example of the invention that was installed by the inventor and subsequently inspected by the inventor for its operation under field conditions was not clear and convincing evidence of a public use).  Sukup,

27

thus fails to present clear and convincing evidence that the Vogel Popcorn bin door was in public use before the Critical Date.

Sukup argues that all testing of the 271 Patent was completed on May 17, 1990, when the tests done at the University of Illinois were completed. The Court disagrees.  The fact that some testing was completed does not mean that other testing may not be necessary.  Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 551 (Fed.Cir. 1990).  In this case, the University of Illinois tests only tested the strength of the new design to withstand hoop stresses.  The testing did not test the efficacy of the new latching device to open and close the door and to solve the problem of the door sticking after the bin was emptied.  The installation at the Vogel Popcorn bin allowed GSI to test the latching device under field conditions.

Sukup argues that the subjective testimony of GSI employees is not sufficient to show that the use was experimental.  Subjective testimony of the inventor's motivation is not controlling.  Sinskey v. Pharmacia Ophthalmics, 982 F.2d 494, 499 (Fed.Cir. 1992).  The evidence presented, however, is more than a statement of subjective motivation.  The evidence regarding the events surrounding the Vogel Popcorn bin installation all point to experimental use:  the single installation of one hand-made door,

the lack of any charge for the door, the instructions from the inventor on the use of the door, and the monitoring of the use by GSI personnel.

Sukup argues that GSI must present documentary evidence. The Court disagrees. The cases cited by Sukup involved situations in which the other evidence, unrelated to subjective motivation, showed a commercial sale or public use. E.g., Sinskey, 982 F.2d at 498 (Inventor admitted in his deposition that the invention did not need to be tested, but then tried to contradict his deposition in a declaration). Here the evidence that is independent of statements of subjective motivation shows an experimental use. Sukup has failed to present evidence that would meet its burden of proof to overcome the presumption of validity with respect to this issue.

B.    § 102 Prior Use by Stormor and Brock/Grossman

Sukup further argues that the Grossman/Brock and Stormor pins and latches invalidate Claim 14 of the 271 Patent. Sukup argues that the Grossman and Stormor designs are so close to the language of Claim 14 that they constitute both a public use and a commercial sale of the invention for years before the Critical Date, and thus bar the patentability of the Claim. 35 U.S.C. § 102. The Court disagrees.

A patent claim is barred if, before the Critical Date, others either

placed the described invention in public use, or offered the described invention for commercial sale. 35 U.S.C. § 102. To constitute a public use or commercial sale, however, the device developed and used by others must include each and every element of the claim. <u>Juicy Whip</u>, 292 F.3d at 737. In this case, Claim 14 describes: (1) a latch that uses a cam to force a grain bin door cover panel closed; and (2) an improved pin that uses a pin fastened onto the interior wall of the bin door frame by a bolt.

The Grossman/Brock design did not use a separate pin on the interior of the bin door frame. Rather, the head of the bolt acted as the pin on the interior of the door frame. The Grossman/Brock grain bin door, thus, did not include each and every element of Claim 14 of the 271 Patent. The existence of the Grossman/Brock grain bin door does not show a prior public use or commercial sale of the claimed invention described in Claim 14.

The Stormor design used a separate pin and bolt, and so, included that aspect of Claim 14. GSI argues that the Stormor pin did not include a shoulder that fit into the hole in the door frame, but Claim 14 makes no mention of either the shoulder, or the pin fitting into the hole in the door frame. The description of the shoulder on the pin was in the drawings and the description of the preferred embodiment of the 271 Patent, not Claim

30

14.  Claim 14 covered any pin that sits against the interior surface of the door frame and is attached by a bolt.  The Court cannot read a limitation from the specifications into Claim 14.  <u>See</u> <u>Markman Opinion</u>, at 4-5, and cases cited therein.  The Stormor cap/nut pin and bolt fit the description of that portion of the invention set forth in Claim 14.

The Stormor latch, however, did not include every element of the latch described in Claim 14.  As quoted above, the Court construed Claim 14 to include "a rotating piece that creates a mechanical advantage as it moves along the catch on the door frame to pull the cover member closed." <u>Markman Opinion</u>, at 18.  The Stormor latch did not create a mechanical advantage by moving along the catch on the door frame.  The hook edge of the latch interlocked with the hook edge on the door frame; this action did not create a mechanical advantage, and the hook edge of the latch did not move along the catch on the door frame.  Rather, the mechanical advantage was created by the cam mechanism inside the latch.  The Stormor latch, therefore, did not include this element of Claim 14.

Sukup cites various opinion evidence concerning the meaning of Claim 14 and whether the Stormor or Grossman design contained each element of Claim 14.  The meaning of Claim 14 is an issue of law for the Court.  The

Court construed disputed aspects of Claim 14 in the <u>Markman Opinion</u>.
Under that construction, neither the Stormor nor the Grossman/Brock
design contained each and every element of the Claim.  Thus, neither design
constituted a public use or commercial sale of the device described in Claim
14.  <u>Juicy Whip, Inc.</u>, 292 F.3d at 737.  The 271 Patent meets the
requirements of § 102 of the Patent Act.  GSI is entitled to partial summary
judgment on this point.

    C.    <u>§ 112 Disclosure of the Best Mode</u>

An inventor is obligated to disclose in the specifications of the patent
"the best mode contemplated by the inventor of carrying out his invention."
35 U.S.C. § 112.  The specifications include the abstract of the invention,
summary of invention, detailed description of the preferred embodiment of
the invention, and the detailed drawings of the preferred embodiment.
<u>Playtex Products, Inc. v. Procter & Gamble Co.</u>, 400 F.3d 901, 909
(Fed.Cir. 2005).  An inventor should not gain the benefit of the patent
monopoly without disclosing all of the relevant information known to him
about the invention.  <u>Manville</u>, 917 F.2d at 552.  Thus, a patent will be
invalid if the quality of the patent applicant's disclosure of the best mode
is so poor that it effectively amounts to concealment of the best mode.  <u>U.S.</u>

Gypsum Co. v. National Gypsum Co., 74 F.3d 1209, 1215 (Fed.Cir. 1996).

Sukup argues that GSI did not disclose the best mode of the invention because the 271 Patent did not disclose that the pin contained a shoulder that improved the bearing of the force exerted by the door frame and the door to shear off the bolt as the hoop stress forced the bin to expand. Bestwick explained in his deposition that the improved pin has two parts with different diameters.  The part that fits into the hole in the door jamb is smaller than the part that sits on top of the door jamb and is covered by the hole in the door panel.  Bestwick testified in his deposition that this was an important feature of his design.  The design was better than previous designs at handling the shear forces, or loads, that occurred when the bin was filled.

Sukup argues that this feature of Bestwick's invention was not adequately disclosed in the 271 Patent, "Thus, there is no genuine issue of fact that Bestwick knew of a better mode of practicing the invention, namely, the use of a pin having a shoulder that was received within a hole in the door frame to provide a shear surface area."  Motion 454, at 28. Sukup argues that "Bestwick failed to disclose this better mode of practicing his invention."  Id.  The Court disagrees.

33

The 271 Patent disclosed the improved pin with shoulder. The drawings in the 271 Patent, reproduced in Appendix F, show the pin with the two parts with the two different diameters. The drawings also show the smaller diameter shoulder fitting into the hole in the door frame so that the bolt does not touch either the door frame or the door panel; the drawing, thus, shows that only the shoulder of the pin is directly subject to the shear forces from the door frame.

The text of the 271 Patent also discusses the fact that the pin, rather than the bolt, takes the shear forces. The 271 Patent description of the preferred embodiment states that the "loads between the jamb and the cover members are substantially transferred by the frictional engagement of the pin member . . . and not by bolt bearing against the edge of enlarged hole. It will be appreciated that, in this manner . . . the bolt is not subjected to substantial shear." 271 Patent, at 4 (reference numbers to the diagram omitted). Sukup has no evidence that the best mode was not disclosed in the 271 Patent, let alone that the disclosure was so poor as to constitute concealment.

D.   § 112 Indefiniteness

Sukup argues that the term "snug fit" in Claim 14 is either vague or

must be interpreted to mean the level of fit defined as a "snug fit" in certain

standards established by the American Society of Mechanical Engineers and

the American National Standards Institute, and also in certain treatises on

mechanical engineering.    However, a patent claim is invalid for

indefiniteness only if the claim is not amenable to construction or is

insolubly ambiguous.  Datamize, LLC v. Plumtree Software, Inc., 417 F.3d

1342, 1347 (Fed.Cir. 2005).  The meaning of patent language is an issue of

law for the Court to determine.  Markman Opinion, at 3.  In construing

patent language, the Court must look to the intrinsic evidence in the patent,

including the specifications, drawings, and descriptions therein.  Id.  The

Court may also consider extrinsic evidence, such as treatises and standards;

however, intrinsic evidence is generally more reliable.  Id.

In this case, the intrinsic evidence, including the specifications,

drawings, and descriptions of the preferred embodiment, show that the term

"snug fit" describes a relationship between each pin on the door frame and

each hole on the door panel, such that each hole is large enough to allow the

door panel to open and close over each pin, but small enough to allow each

pin to engage the side of the hole when the bin is filled without distorting

the shape of the door panel so that the door panel becomes an integrated

part of the wall able to carry the hoop stresses caused by the grain. A "snug fit" occurs when the pins and holes have this relationship.[5] Because the intrinsic evidence is sufficient to define the term "snug fit" in Claim 14, the Court finds that this evidence is more reliable than the extrinsic evidence cited by Sukup.

The Court notes that Sukup did not cite these treatises and standards to the Court at the time of the Markman hearing. Defendant Sukup Manufacturing Co.'s Pre-Markman Hearing Brief (d/e 75) (Sukup Markman Brief), at 11; Defendant Sukup Manufacturing Co.'s Exhibit List for Markman Hearing (d/e 76), at 1; Defendant Sukup Manufacturing Co.'s Response to Plaintiff the GSI Group, Inc.'s Post-Markman Hearing Brief Regarding Construction of U.S. Patents 6,073,364; 6,076,276; 6,233,843; 5,135,271; and 5,400,525 (d/e 94),at 2-3. Indeed, Sukup urged the Court to use the term "snug fit" in its interpretations of claim language without ever indicating to the Court that Sukup believed that the term was either vague or had a precise meaning found in standards and treatises. See e.g., Sukup Markman Brief, at 11. If Sukup believed that these extrinsic

---

[5]The "fits snugly" in the Court's construction of portions of Claims 1 and 9, quoted above, carries an identical meaning.

materials were needed to interpret the term "snug fit" in Claim 14, it should have provided the extrinsic references at that time.[6]  Regardless, the term "snug fit" is not vague and is readily defined based on the intrinsic evidence in the Patent.  The 271 Patent meets the requirements of §§ 102 and 112 for validity.

E.    § 103 Obviousness

Next, Sukup argues that the 271 Patent is invalid because the invention was obvious from the prior art.    Sukup relies on the Grossman/Brock and Stormor closures, and Oswald Patent.  Sukup argues that, either separately or in combination, these devices render the closure device in the 271 Patent obvious and so render the Patent invalid.

An invention cannot be patented if, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103.  An issue of obviousness arises when the patent combines elements that were known in the field, "[t]he combination

_____

[6]The failure to do so indicates a disturbing lack of candor with the Court that should not be repeated in the future.

37

of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." KSR Intern. Co. v. Teleflex, Inc., __ U.S.__, 127 S.Ct. 1727, 1739 (2007). The factual question is whether a person of ordinary skill in the art would readily recognize and be able to combine the existing elements in the manner set forth in the invention to be patented.  The Supreme Court explained:

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

Id., at 1740.  The resolution of this issue may be complex and fact-intensive:

> Often it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

Id.

In making this analysis, the Court must consider the invention as a whole rather than in individual components.  Ruiz v. A.B. Chance, Co., 357

F.3d 1270, 1275 (Fed.Cir. 2004). The Court must also analyze evidence of secondary considerations which include the commercial success of the claimed invention, and the existence of a long recognized need for the claimed invention. These secondary considerations provide circumstantial evidence regarding the obviousness of the item. <u>Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.</u>, 976 F.2d 1559, 1573 (Fed.Cir. 1992).

The parties dispute which party has the burden of presenting evidence to show that the invention in the 271 Patent was or was not obvious under § 103. Sukup argues that GSI has the burden of presenting evidence to overcome its request for summary judgment. GSI argues that Sukup must present evidence to overcome the statutory presumption that the 271 Patent is valid.

GSI must present evidence on each element on which it will have the burden of proof at trial. <u>Celotex Corp.</u>, 477 U.S. at 322. In this case, GSI has presented evidence to meet its burden with respect to the validity of the 271 Patent under § 103 because it has presented evidence that the 271 Patent was issued. The 271 Patent, therefore, is presumed to be valid under § 103. 35 U.S.C. § 282. GSI has no other burden at trial with respect to

validity. Thus, to secure summary judgment, Sukup has the burden to demonstrate that it has clear and convincing evidence of obviousness under § 103 that will overcome this presumption.

Sukup must present evidence to show, "the level of ordinary skill in the pertinent art." Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17 (1966). Sukup, however, does not cite to the Court any evidence regarding the level of skill and background knowledge of the person with ordinary skill in the art at issue here. Thus, Sukup fails to meet its burden to present evidence to prove the obviousness of the 271 Patent.

Beyond that, Sukup has, generally, only shown that issues of fact exist regarding whether the presumption of validity of the 271 Patent can be overcome under § 103 for obviousness. Sukup has not presented evidence that the invention was obvious from the Grossman/Brock and Stormor closure devices alone. Neither device provided any mechanism for forcing the door off the pins after the door panel had been subjected to hoop stresses and had become stuck on the pins in the door jamb.

The Oswald Patent disclosed a device using a lever and a cam to force a window or door closed and opened. The Oswald Patent further specifically stated that the cam device provided a way to force open a stuck

window.  The Oswald Patent, however, is not related to grain bins.  The Patent Examiner considered the Oswald Patent, but determined that it did not preclude the patentability of the 271 Patent because the Oswald Patent did not address a situation involving a door panel that was designed to be integrated into a structure like grain bin doors.

Sukup argues, however, that the combination of the Oswald Patent and the Stormor and Grossman/Brock closure devices render the 271 device obvious.  This is, again, an issue of fact.  When viewed in the light most favorable to GSI, the Oswald Patent may be in such a different field that a person of ordinary skill in the art would not see the possibility of combining a cam device with the prior closure devices to overcome the problem of stuck cover panels.  There is at least an issue of fact on these points.[7]

Sukup argues that the Patent Examiner used a too narrow definition of obviousness to reject the possibility that the Oswald Patent rendered the

---

[7]The Court notes that Claim 14 may be obvious under § 103 based on the Stormor cap/nut and bolt design combined with the Grossman/Brock latching handle. The Court declines to enter partial summary judgment on this issue, however, because the issue is not whether the Court believes Claim 14 is obvious, but whether a person with ordinary skill in the art would find Claim 14 obvious.  Sukup has not presented evidence regarding the level of skill and background knowledge of the person with ordinary skill in the art, so issues of fact remain as to the obviousness of all claims at issue, including Claim 14.

271 Patent closure device obvious.  The Supreme Court in <u>KSR</u> recently reversed the Federal Circuit Court of Appeals for using the method of analysis of obviousness that was too narrow.  <u>KSR</u>, 127 S.Ct. at 1739.  The Patent Examiner did not set out his method of analyzing the question of obviousness, so it is unclear whether his definition was consistent with the Supreme Court's decision under <u>KSR</u>.  This Court, however, applied the correct standard and found that issues of fact exist.  Sukup's request for partial summary judgment that the 271 Patent was obvious under § 103 is denied.  The issue of whether the 271 Patent meets the requirements of § 103 is left for trial.

      F.    <u>Sukup's Affirmative Defense and Counterclaim for Inequitable Conduct</u>

Sukup asserts that the 271 Patent is invalid because GSI engaged in inequitable conduct in prosecuting the Patent.  Inequitable conduct is an equitable matter that is committed to the discretion of this Court.  <u>Molins PLC v. Textron, Inc.</u>, 48 F.3d 1172, 1178 (Fed.Cir. 1995).  Patent applicants are required to prosecute patent applications in the PTO with candor, good faith, and honesty.  Inequitable conduct occurs when: (1) a patent applicant misstates a material fact, fails to disclose a material fact, or

submits false information to the PTO; coupled with (2) an intent to deceive. The party raising the claim of inequitable conduct has the burden to prove the claim by clear and convincing evidence.  Id.

Materiality is determined from the view of the reasonable Patent Examiner.  Information is material when there is a substantial likelihood that a reasonable Examiner would have considered the information important in deciding whether to allow the application to issue as a patent. If the information is cumulative or not as pertinent as that considered by the examiner, then such information is not material.  Id., at 1179.  Intent to deceive may be proven by circumstantial evidence; however, the circumstantial evidence must demonstrate more than gross negligence.  Id., at 1178.

Sukup argues that the 271 Patent is invalid because GSI did not disclose all relevant information to the PTO in its patent application. Sukup argues that GSI failed to disclose the installation of the door at the Vogel Popcorn bin; failed to disclose the best mode of the invention; and, misled the PTO with respect to whether the Stormor cap/nut and bolt design met the description of the improved pin structure in Claim 14.

GSI admits that it did not disclose the Vogel Popcorn installation, but

argues that Sukup has no clear and convincing evidence that: (1) the Vogel Popcorn installation was material, and (2) GSI did not disclose the installation with the intent to deceive or mislead the PTO.  The Court agrees.  The experimental use did not affect the validity of the patent application, and so its disclosure was of minimal significance.  Sukup's only evidence on intent is the fact of the omission.  The failure to disclose this experimental use does not, by itself, indicate any intent to deceive.

Sukup also alleges that GSI did not disclose the best mode for carrying out the invention.  The Court already rejected this argument.  GSI disclosed the best mode.

Sukup finally argues that GSI failed to disclose the Stormor door and pin to the PTO and made misrepresentations to the PTO about the Stormor pin design.  Sukup does not have clear and convincing evidence that GSI failed to disclose the Stormor door and pin.  GSI submitted a sales brochure of the Stormor bin and door to the PTO.  Sukup presents no evidence that GSI had any other documents in its possession regarding the Stormor door and pin.  GSI was not obligated to search for other documents that described the Stormor door and pin.  Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd., 394 F.3d 1348, 1351 (Fed.Cir. 2005).

Sukup points out that the Patent Examiner did not consider the sales brochure because it was undated.  The Patent Examiner's decision did not change the fact that GSI disclosed the Stormor door and pin.

GSI's representation to the PTO regarding the Stormor door, however, presents a closer issue.  GSI stated to the PTO that "On page 4 of the Stormor brochure, there is disclosed some pin structure; however, the latching system and pin structure claimed in the instant application is not disclosed or suggested." 271 History, Information Disclosure Statement, p. 2.  This statement was true: the information in the brochure did not disclose or explicitly suggest the GSI pin structure set forth in Claim 14.  When read in the light most favorable to Sukup, however, GSI's statement was materially misleading because the statement implied that the Stormor pin did not disclose or suggest the pin structure set forth in Claim 14.  As discussed above, the Stormor cap/nut and bolt included the elements of the pin described in Claim 14.  Claim 14 described a tapered pin around a bolt that is held tightly against the inside surface of the bin door frame.  The Stormor pin contained these elements.  The Stormor pin did not include the shoulder that fit into the hole in the door frame to take the shear forces off the bolt; however, GSI only disclosed the shoulder in the specifications in

the Patent; GSI did not include the shoulder as part of the elements of Claim 14. GSI's statement to the PTO, quoted above, thus, when read in the light most favorable to Sukup, was misleading.

The evidence of intent to mislead, however, only rises to the level of gross negligence, even when read in the light most favorable to Sukup. Sukup relies on the fact that Bestwick knew the design of the Stormor cap/nut and pin. Bestwick had been the chief engineer at Stormor, and had designed grain bins for Stormor. Bestwick was able to draw a picture of the design from memory during his deposition. When read favorably to Sukup, this evidence indicates that Bestwick would have known that the Stormor pin met the structure set forth in Claim 14. GSI, however, disclosed the existence of the Stormor door and pin to the PTO. If GSI had intended to deceive the PTO, it would have omitted the Stormor brochure from its application.

In the inequitable conduct cases cited by Sukup, the applicant engaged in far more egregious conduct. E.g., Molins, 48 F.3d at 1176-77 (when applicant learned of the existence of prior art, he dropped all foreign patent applications, but continued to prosecute the U.S. patent application without disclosing the prior art); General Electro Music Corp. v. Samick Music

Corp., 19 F.3d 1405, 1407 (Fed.Cir. 1994) (applicant stated under oath that a search of the prior art had been conducted when no such search had occurred); Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc., 984 F.2d 1182, 1191-93 (Fed.Cir. 1993) (applicant: (1) submitted affidavits from individuals in the field represented to be disinterested who, in fact, had an interest in the patent application; and (2) did not disclose commercial sales of the claimed invention before the one-year bar date); LaBounty Mfg., Inc. v. U.S. Intern. Trade Com'n, 958 F.2d 1066, 1074-75 (Fed.Cir. 1992) (applicant did not disclose commercial sales of the claimed invention before the one-year bar date).  After reviewing the evidence in the light most favorable to Sukup, and the applicable law and regulations, the Court concludes, for purposes of summary judgment, that GSI may have acted with gross negligence in making the quoted statement to the PTO.  Sukup, however, has failed to present evidence that GSI made the quoted statement with the intent to mislead the PTO.  Therefore, this Court determines that GSI is entitled to partial summary judgment on Sukup's affirmative defense and counterclaim of inequitable conduct.

II.   INFRINGEMENT

   Sukup also seeks partial summary judgment because it argues that its

pin and door Handle do not infringe on the 271 Patent, regardless of the Patent's validity.  The determination of infringement is a two-step process. The Court must determine the scope of the claim, and the properly construed claim must be compared to the accused item to determine whether all of the claim limitations are present, either literally or by a substantial equivalent.  Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1247-48 (Fed.Cir. 1998).  The construction of the claim language is a legal issue.  The comparison of the claim language to the accused item is a factual issue.  Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed.Cir. 2004).

The evidence shows that issues of fact exist regarding whether Sukup's grain bin door infringes on Claims 1, 9, and 14 of the 271 Patent.  GSI's expert Harmon Towne sufficiently opined that the Sukup's door Handle infringed on the latching device in the 271 Patent.  See GSI's Opposition to Sukup's Motion 442(d/e 524), Exhibit 1, Deposition of Harmon Towne, at 110-11, 116-17.  The evidence is sufficient to create issues of fact.

Sukup argues that its pins do not have a "snug fit" in the holes in its door panels.  The Court has already rejected Sukup's argument regarding the meaning of "snug fit".  As defined above by the Court, the Sukup pins

48

and holes could have a "snug fit".  There is at least an issue of fact on this point.

Sukup argues that its latching mechanism does not infringe on the 271 Patent because the Sukup Handle does not use a cam mechanism to push the door off the pins.  GSI's expert Towne opined that the Handle so operated.  Sukup's expert Jerry Hall opined that the Handle did not push the door off the pins.  Sukup Sealed Exhibits, Exhibit 51, Declaration of Jerry Hall, ¶ 45.  This creates an issue of fact on this point.

Sukup argues that its second and third generation pins do not infringe on Claim 14 of the 271 Patent because the pin end that faces into the interior of the bin is not tapered in the same manner as that described in the 271 Patent.  Claim 14 is the only claim at issue that addresses GSI's improved pin structure.  As quoted above, Claim 14 states that the end of the pin has an "inwardly extending tapered nose portion."  The engineering drawings of the second and third generation pins show at least some taper on the end of the pin.  The question of whether the amount of taper is enough to infringe is an issue of fact.

Sukup also argues that its second and third generation pins do not infringe on Claim 14 of the 271 Patent pin structure because the second

49

and third generation pins do not use a separate pin and bolt.  Claim 14 states that the improved pin structure involves a pin and a separate bolt that helps "relieve said bolt from shear forces . . . ."  Sukup's second and third generation pins are single-piece pins that incorporate a threaded end used to fasten the pins in place.  This single piece is subjected to the shear forces caused by the pressure from the door panel and side wall of the bin.  Thus, the one piece is subjected to substantial shear forces.  This is not the same as the pin and bolt system described in Claim 14 of the 271 Patent.  There is no literal infringement of the improved pin structure described in Claim 14 by the second and third generation pins.  Sukup is entitled to partial summary judgment on this one factual issue.  <u>Fed. R. Civ. P.</u> 56(d)(1).  There remains an issue of fact concerning whether the Sukup door is still a substantial equivalent to the claimed invention set forth in Claim 14, even with the second and third generation pins.  Thus, issues of fact remain on the overall question of infringement.

THEREFORE, Plaintiff GSI Group, Inc.'s Motion for Partial Summary Judgment that GSI's Bin Door Patent (U.S. Patent No. 5,135,271) is Valid as to 35 U.S.C. §§ 101, 102, and 112 (d/e 400) is ALLOWED.  The Court enters partial summary judgment in favor of Plaintiff GSI Group, Inc., and

against Defendant Sukup Manufacturing Co., to the extent that 271 Patent meets the requirements for validity set forth in Patent Act §§ 101, 102, and 112. 35 U.S.C. §§ 101, 102, & 112. GSI's Motion for Partial Summary Judgment Against Sukup's Inequitable Conduct Affirmative Defense and Counterclaim, and for a Declaration of Enforceability as to GSI's Bin Door Patent (d/e 420) is ALLOWED in part. The Court enters partial summary judgment in favor of Plaintiff GSI Group, Inc., and against Defendant Sukup Manufacturing Co., on Sukup's affirmative defense and counterclaim of inequitable conduct with respect to the 271 Patent, but DENIES partial summary judgment on Plaintiff GSI's request for a declaration of enforceability as to the 271 Patent because issues of fact remain as to obviousness. 35 U.S.C. § 103. Defendant Sukup Manufacturing Co.'s Alternative Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,135,271 (d/e 454) is DENIED. Sukup's Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 5,135,271 (d/e 442) is ALLOWED in part. The Court enters partial summary judgment in favor of Sukup Manufacturing Co. and against GSI Group, Inc. to the extent that the Court determines, pursuant to Rule 56(d)(1), that Sukup's second and third generation pins do not literally infringe on pin structure set forth in Claim

14 of the 271 Patent.  <u>Fed. R. Civ. P.</u> 56(d)(1).  The Motion (d/e 442) is

otherwise DENIED.

IT IS THEREFORE SO ORDERED.

ENTER:   September 11, 2008

      FOR THE COURT:

                             <u>       s/  Jeanne E. Scott       </u>
                                  JEANNE E. SCOTT
                         UNITED STATES DISTRICT JUDGE

## APPENDIX A



271 Patent, at 2.

APPENDIX B



FIG.7.

271 Patent, at 3.

APPENDIX C



Sukup Unsealed Exhibits, Exhibit 18, U.S. Patent 2,767,008, at 1.

# APPENDIX D



<u>Motion 454</u>, at 39.

APPENDIX E



U.S. Patent No. 4,913,478, at 2.

APPENDIX F



FIG.8.



FIG.4.

271 Patent, at 3.

APPENDIX G



*Crossman/Brock*



*Stormor*

<u>Motion 454</u>, at 35.

# APPENDIX H



<u>Sukup Sealed Exhibits</u>, Exhibit 55.

# APPENDIX I



<u>Sukup Sealed Exhibits</u>, Exhibit 128.

# APPENDIX J





<u>Sukup Sealed Exhibits</u>, Exhibit 128.

APPENDIX K



Sukup Unsealed Exhibits, Exhibit 1.