E-FILED
Tuesday, 28 October, 2008  02:08:05 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| THE GSI GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3011 |
| | ) | |
| SUKUP MANUFACTURING CO., | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on the Motion for Summary Judgment by Defendant Sukup Manufacturing Company (Sukup) on Plaintiff's Unfair Competition Counts (d/e 453) (Motion 453), and Plaintiff GSI Group, Inc.'s (GSI) Motion for Partial Summary Judgment as to GSI's Count IV for Sukup's Federal Deceptive Trade Practices (d/e 455) (Motion 455).  GSI has alleged that Defendant Sukup infringed on several patents held by GSI, including patents on tower grain dryers.  <u>Third Amended Complaint for Patent Infringement and Unfair Competition (d/e 129) (Third Amended Complaint), Counts I-III</u>.  GSI also alleges in Counts IV through VII that Sukup engaged in deceptive business practices and unfair

competition in connection with marketing tower grain dryers in violation of state and federal law.  Id., Counts IV-VII (Unfair Competition Counts). Count IV alleges a violation of the Lanham Act.  15 U.S.C. § 1125(a). Count V alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act).  815 ILCS 505/1 et seq. Count VI alleges a violation of the Illinois Uniform Deceptive Trade Practices Act (Uniform Act).  815 ILCS 510/1 et seq.  Count VII alleges a violation of the Illinois common law of unfair competition.

Sukup seeks summary judgment on GSI's Unfair Competition Counts, and GSI seeks partial summary judgment on Count IV.  For the reasons set forth below, Motion 453 and Motion 455 are ALLOWED in part.  GSI has established that Sukup made literally false statements in its marketing materials and used those materials to tout its tower grain dryers in interstate commerce.  Issues of fact, however, remain regarding other elements of GSI's claims in Counts IV, VI and VII.  Sukup, however, is entitled to summary judgment on the Consumer Fraud Act claim in Count V.  Sukup is also entitled to partial summary judgment on Counts IV, VI and VII to the extent that GSI's potential monetary claims under those Counts are limited to disgorgement of profits.

## STATEMENT OF FACTS

GSI sells tower grain dryers.  These dryers are large cylinders twelve to twenty-four feet in diameter and approximately fifty to one hundred fifty feet tall.  A tower dryer cylinder stands up vertically.  The dryer cylinder has inner and outer perforated walls that are approximately twelve inches apart. The dryer has a heat source in the center of the cylinder.  The grain is fed into the top of the cylinder and flows down in the space between the inner and outer walls.  The heated air from the heat source in the center of the dryer cylinder passes through the perforated walls and dries the grain as it flows down between the inner and outer walls.  The dried grain at the bottom is then unloaded from the dryer.  See Opinion entered July 27, 2007 (d/e 311) (Opinion 311), at 2-3.

GSI sold one type of tower dryer under the trade name Zimmerman (Zimmerman Dryer).  In 2003, GSI produced a brochure for its Zimmerman Dryer (Zimmerman Brochure).  Opposition to Sukup's Motion for Partial Summary Judgment as to GSI's Unfair Competition Counts (d/e 453) (d/e 513) (GSI Opposition 513), Exhibit 2 (d/e 515), Zimmerman Brochure. The back cover of the Zimmerman Brochure included a grid of statistics about the capabilities of the Zimmerman Dryers (Zimmerman Grid).

3

Attached as Appendix A is a copy of the Zimmerman Grid.  Each column in the Zimmerman Grid contained one of fourteen statistics concerning either the dimensions or the capabilities of one of fourteen different models of Zimmerman Dryers.  At the time that GSI produced the Zimmerman Brochure, Randy Coffee and George Geoffrey Griffin worked for GSI.  Coffee was GSI's Vice President for Corporate Drying.  Sukup Unsealed Exhibits (d/e 461), Exhibit 156, Declaration of Randy E. Coffee (Coffee Declaration), ¶ 6.  Griffin was a sales representative for GSI.  In 2003, Coffee and Griffin went to work for Sukup.  Griffin sold tower dryers for Sukup.  Sukup Unsealed Exhibits, Exhibit 53, Declaration of George Geoffrey Griffin, ¶ 2.  Coffee became Sukup's Director of Marketing. Coffee Declaration, ¶ 8.

Sukup started developing grain dryers in 2003.  Sukup started marketing tower grain dryers in 2004.  Between November 2004 and January 2005, Sukup developed a specification sheet for its tower dryers (Sukup Spec Sheet).  GSI Opposition 513 Exhibit 5 (d/e 516), Sukup Spec Sheet.  The specifications on the Sukup Spec Sheet were copied by Coffee from the Zimmerman Grid, except for three categories.  GSI Opposition 513, Exhibit 3, Deposition of Randy Coffee, at 60-61.  The three categories

that were different were "Heat Holding Bushels," "Cool Holding Bushels,"
and "Total Holding Bushels."  Attached as Appendix B is a copy of the
Sukup Spec Sheet.  The Sukup Spec Sheet had a footnote that said,
"Dimensions are subject to change."

The three categories that varied from the Zimmerman Grid all
concerned the volume of grain that could be held in the dryer.  The "Heat
Holding Capacity" referred to the volume of grain that could be held in the
heated section of the dryer.  The "Cool Holding Capacity" referred to the
volume of grain that could be held in the cooling section of the dryer.  The
"Total Holding Capacity" referred to the total volume of grain that could be
held in the dryer.  <u>Motion 455</u>, Exhibit 1, <u>Declaration of David Morrison
in Support of GSI's Motion for Partial Summary Judgment (Morrison
Declaration)</u>, ¶¶ 18-20.

The Sukup Spec Sheet stated that each Sukup dryer had a larger Heat
Holding Capacity, Cool Holding Capacity, and Total Holding Capacity than
a comparable GSI dryer of the same size.  Sukup employee Kevin Janssen
stated that inadvertently he miscalculated the Heat Holding Capacity, Cool
Holding Capacity, and Total Holding Capacity figures.  He incorrectly
included the volume in the unloading section of the dryer as part of the

holding capacity.  <u>Sukup Sealed Exhibits (d/e 460)</u>, Exhibit 103, <u>Deposition of Kevin Janssen</u>, at 134-35.

The Sukup Spec Sheet also listed thirteen different models of Sukup dryers ranging from 12 feet in diameter to 18 feet in diameter.  In 2004, however, Sukup designed only one dryer.  That dryer was 18 feet in diameter.  One such dryer was sold in 2004 and erected at the Rosenwinkel Farm in Waterman, Illinois.  <u>Motion 455</u>, Exhibit 6, <u>Deposition of George Geoffrey Griffin (Griffin Deposition)</u>, at 125.

Sukup did no testing or analysis to determine whether the Sukup dryers performed similarly to the Zimmerman Dryers.  Rather, Coffee states that he prepared the Sukup Spec Sheet based on his personal historical knowledge of dryer performance and his experience in selling tower dryers, including the Zimmerman tower dryer specifications and literature.  <u>Coffee Declaration</u>, ¶ 27.  Coffee had worked in the tower dryer and grain dryer industry for over thirty years.  <u>Id.</u>, ¶ 2.  Coffee states that he knew from his experience that the statistics in the Zimmerman Brochure were a reasonable estimate of a tower dryer's performance.  <u>Id.</u>, ¶ 31.  Coffee states that the drying rate statistics are standard in the tower dryer industry and are estimates.  Other tower dryer manufacturers used the same estimates.  At

the same time, however, Coffee states that he is not aware of any industry standards used to measure the drying rate performance of a tower dryer. Id., ¶¶ 23-26, 42. Coffee also included Janssen's inaccurate calculations of the holding capacities in the Sukup Spec Sheet.

Sukup distributed the Sukup Spec Sheet to sales representatives with instructions not to distribute it to customers. Coffee Declaration, ¶ 36. However, GSI presents evidence that Sukup personnel, including Coffee and Griffin, distributed the Sukup Spec Sheet to customers. Griffin Deposition, at 111-122; GSI Opposition 513, Exhibit 8, Sukup Price Quotations sent by Randy Coffee to Customers with Sukup Spec Sheet Attached.

In December 2005, Sukup published a sales brochure for its tower dryers (Sukup Brochure). GSI Opposition 513 Exhibit 19 (d/e 518), Sukup Brochure. The Sukup Brochure also contained a grid of specifications for its tower dryers. Attached as Appendix C is a copy of the grid from the Sukup Brochure (Sukup Brochure Grid). As with the Sukup Spec Sheet, almost all of the numbers on the grid in the Sukup Brochure were copied from the Zimmerman Grid. The only exceptions were categories, "Heat Holding Bushels," "Cool Holding Bushels," "Total Holding Bushels," "Overall Height," and "AC Drive Metering HP." The Sukup Brochure Grid

contained the following footnote,

> BU/Hr (bushels per hour) listed are wet bushels, shelled corn at listed moisture content and are estimates based on drying principles, field results and computer simulation. Drying variances may occur due to grain kernal (sic) size, variety, maturity levels, excessive fines, adverse weather conditions, etc.

Sukup, however, did not perform any computer analysis or collect any data from field results to determine the applicability of the statistics on the Zimmerman Brochure to the Sukup dryers. Rather, Coffee relied on his experience to produce the information in the page of statistical estimates. Coffee Declaration, ¶ 27. Sukup also continued to use Janssen's erroneous calculations of the holding capacities.

GSI's expert Harmon Towne opined that the "Heat Holding Bushels," "Cool Holding Bushels," and "Total Holding Bushels" in the Sukup Spec Sheet and the Sukup Brochure Grid (collectively the Sukup Grids) were incorrect. The dryer cylinders lacked the necessary space to hold the volume of grain stated in either of the Sukup Grids. Rather, the Heat Holding Capacity, Cool Holding Capacity, and Total Holding Capacity would be substantially similar for a Sukup and Zimmerman dryer of the same size. Motion 455, Exhibit 18, Report of Harmon Towne dated October 23, 2007, ¶ 42. Sukup's expert Lloyd Lerew agreed that the figures in these categories

were misstatements.  <u>Motion 455</u>, Exhibit 15, <u>Report of Lloyd E. Lerew,</u>
<u>PhD., dated November 9, 2007</u>, at 8, ¶¶ 9-10.  Lerew also agreed that the
holding capacity specifications should be the same for Zimmerman and
Sukup dryers with the same dimensions using the same heaters and blowers.
<u>Id.</u>, at 20.

GSI's expert David Morrison opined that the holding capacity of a
tower dryer affects the efficiency of the dryer and its cost of operation.  If
a dryer has a greater heat and cool holding capacity, the dryer can operate
at a lower temperature and so use less fuel to dry the same amount of grain.
<u>Motion 455</u>, Exhibit 1, <u>Morrison Declaration</u>, ¶¶ 24, 26.  Morrison opined
that the heating and cooling holding capacity were important considerations
for purchasers of tower dryers.  <u>Id.</u>, ¶¶27-29.  Sukup's expert Lerew opined
that the capacity specifications were not important to customers.  He opined
that tower dryer customers would not use these statistics in deciding
whether to purchase a particular dryer.  <u>Sukup Unsealed Exhibits (d/e 461)</u>,
Exhibit 157, <u>Declaration of Lloyd Lerew</u>, ¶¶ 19-22; <u>Sukup Sealed Exhibits</u>
<u>(d/e 460)</u>, Exhibit 105, <u>Deposition of Michael R. Stricker</u>, at 86-88.

GSI presents evidence that Sukup and GSI sell dryers in the same
market and that Sukup sold dryers to past and current GSI customers.

Motion 455, Exhibit 22, Report of Mark Hoffman dated October 1, 2007, at 5-6.  GSI also presents anecdotal evidence that at least one customer, Timothy Sullivan, considered the Sukup Grids in making a purchasing decision; however, Sullivan stated that he was not considering buying a GSI tower dryer under any conditions.   GSI Opposition 513, Exhibit 25, Deposition of Timothy Sullivan, at 52-53.  The representative of one other prospective customer, Wheeler Grain, told GSI representative David Morrison that Sukup's dryer had larger holding capacities based on one of the Sukup Grids.  Morrison explained to the Wheeler representative that the dryers had the similar dimensions, and so, had to have similar holding capacities.  Wheeler Grain bought a dryer from GSI rather than Sukup. Sukup Sealed Exhibits, Exhibit 84, GSI Rule 30(b)(6) Deposition of David Morrison, at 98-99.  Sukup presents evidence that other customers bought dryers from Sukup instead of GSI because of considerations other than the estimates on the Sukup Grids.  Id., at 127-34, 137; Sukup Sealed Exhibits, Exhibit 70, Deposition of Gerald Martin, at 57.

Finally, GSI stated in discovery and pretrial filings that the only monetary damages sought by GSI in any of the Unfair Competition Counts is disgorgement of Sukup's profits.  GSI does not seek damages for lost

profits.   Combined Motion and Memorandum for a Protective Order Requiring Sukup to Withdraw its Subpoena of BKD LLP (d/e 343), at 1; Sukup Sealed Exhibits, Exhibit 144, Rule 30(b)(6) Deposition of GSI and Mark Hoffman, at 33-34.

## ANALYSIS

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial must be resolved against the movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once a movant has met its burden, the non-moving party must present evidence to show that issues of fact remain with respect to an issue essential to its case, and on which it will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

GSI brings four counts against Sukup for unfair trade practices and deceptive business practices.  Sukup seeks summary judgment on all four claims.  The federal claim, Count IV, is based on the Lanham Act.  The

Lanham Act prohibits making a false or misleading representation in connection with any goods or service which is likely to cause confusion or mistake. Id. Count VI is based on the catchall provision of the Uniform Act. 815 ILCS 510/2(12). Like the Lanham Act, the catchall provision prohibits conduct done in the course of business, vocation, or occupation that creates a likelihood of confusion or misunderstanding. Given the similarity in the statutes, the catchall provision of the Uniform Act should be analyzed under the same principles as the Lanham Act. See Bob Creeden & Associates, Ltd. v. Infosoft, Inc., 326 F.Supp.2d 876, 880 (N.D.Ill., 2004). The Uniform Act is also a codification of common law. Mars, Inc. v. Curtiss Candy Co., 8 Ill.App.3d 338, 344, 290 N.E.2d 701, 704 (Ill.App. 1st Dist., 1972). GSI's common law unfair competition claim is also analyzed under the same principles as the Uniform Act. Thus, Counts IV, VI, and VII are all analyzed under principles of the Lanham Act.

Under the Lanham Act, GSI must present evidence that: (1) Sukup made a false or misleading statement; (2) the statement actually deceived or was likely to deceive a substantial segment of the advertisement's audience; (3) the statement was material to the decision to purchase the goods; (4) Sukup made the statement to tout goods entering interstate

12

commerce; (5) and the act resulted in actual injury or created a likelihood of injury to GSI.  If GSI presents evidence of literally false statements, then GSI does not need to present evidence that the statement actually deceived or was likely to deceive customers.  <u>B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.</u>, 168 F.3d 967, 971-72 (7th Cir. 1999).

GSI has presented uncontroverted evidence that Sukup made literally false statements in its advertisements, and that Sukup made these statements to tout dryers that entered interstate commerce.  The Sukup Brochure stated that the estimates on the Sukup Brochure Grid were based on "field results and computer simulation."  That was false.  Sukup collected no data from field results and conducted no computer simulations.  <u>See BASF Corp. v. Old World Trading Co., Inc.</u>, 41 F.3d 1081, 1091 (7th Cir. 1994) (a statement that "tests show x" is literally false if no test shows "x"). In addition, the Heat Holding Capacities, Cool Holding Capacities, and Total Holding Capacities on the Sukup Grids were incorrect.  Sukup made literally false statements in its advertising.  Because the statements were literally false, GSI does not need to present evidence that customers were deceived or were likely to be deceived.  <u>B. Sanfield, Inc.</u>, 168 F.3d at 971. Sukup, further, made these statements as part of its efforts to market tower

dryers in interstate commerce.  GSI is entitled to partial summary judgment on these three elements of its Lanham Act claim.[1]  Fed. R. Civ. P. 56(d)(1).

Issues of fact, however, remain regarding whether the false statements were material to a decision to purchase the goods and whether the false statements resulted in actual injury to GSI or have created a likelihood of injury to GSI.  The parties have submitted conflicting expert testimony and anecdotal evidence.  In particular, some evidence indicates that the representative of Wheeler Grain was confused by the Sukup Grids' representations about holding capacities.  GSI representative Morrison was able to dispel the confusion, but the evidence that the Sukup Grids confused a potential purchaser is evidence that the Sukup Grids may be material and that there may be a likelihood of injury to GSI.  Given the conflict in the evidence, issues of fact remain on these two elements.  The remainder of GSI's request for summary judgment on Count IV is denied.

Sukup also seeks summary judgment on Counts IV, VI, and VII.  As set forth above, GSI is entitled to proceed on these claims.  However, GSI has limited its monetary claims under these Counts to disgorgement of

---

[1]GSI does not seek partial summary judgment on Counts VI and VII, so the Court does not enter partial summary judgment on these elements in these Counts.

14

profits.   Sukup, therefore, is entitled to partial summary judgment on Counts IV, VI and VII to the extent that GSI is limited to disgorgement of profits and cannot seek lost profits or other compensatory damages.

Sukup argues that it is entitled to summary judgment on Counts IV, VI, and VII because the Sukup Spec Sheet was not advertising, and so, the Lanham Act does not apply to it.  However, Sukup concedes that Griffin distributed the Sukup Spec Sheet to prospective customers.  GSI has presented evidence that Coffee sent the Sukup Spec Sheet to prospective purchasers along with price quotations.  The evidence, thus, indicates that Sukup used the Sukup Spec Sheet as part of its advertising.

Sukup also argues that the Sukup Spec Sheet was not deceptive because it contained the  disclaimer that "Dimensions are subject to change."  This is a <u>non</u> <u>sequitur</u>.  Even if the dimensions were subject to change, Sukup still made the representations contained in the Sukup Spec Sheet concerning the dryers described on the Sheet.  With respect to those dryers, Sukup made false statements concerning the holding capacities.

Sukup argues that the Sukup Grids were just estimates and so cannot be false.  Again, the Court disagrees.  First, the holding capacities were false; Janssen admits he miscalculated those capacities.  Sukup's expert Lerew

agrees that the holding capacity figures were incorrect.  Second, the Sukup Brochure Grid stated that the estimates were based on field results and computer simulations.  This representation was false.  Coffee relied on his experience to copy GSI's numbers, not any analysis of data.  These statements in the Sukup Grids were false.

Sukup also argues that other tower dryer manufacturers used the same estimates.  This observation is irrelevant to the issue.  Sukup represented to its potential customers that its estimates were based on field results and computer simulations.  This was false.  The fact that other companies published similar estimates is not pertinent and does not provide a defense to the falsity of Sukup's representations.[2]  Furthermore, Sukup presents no evidence that other tower dryer manufacturers distributed false estimates of their dryers' holding capacities.

Sukup also argues that GSI must prove actual injury.  The Lanham Act, however, does not require proof of actual injury.  Rather, GSI must only present evidence of a likelihood of injury.  B. Sanfield, Inc., 168 F.3d at 972.  As discussed above, GSI presented evidence that the representations

---

[2]The Court does not address whether any of Sukup's evidence is or is not relevant to Sukup's position regarding materiality or the likelihood of injury.

in the Sukup Grids were important factors that affected the purchasing decision of potential customers.  The incident with the Wheeler Grain representative indicates that potential customers could have been confused by the false statements in the Sukup Grids to the detriment of GSI.  Sukup's evidence disputes this, but the conflicting evidence only creates an issue of fact.  Sukup is not entitled to summary judgment on the Lanham Act and the state unfair competition counts.

Last, Sukup argues that GSI cannot proceed on its evidence that the holding capacities in the Sukup Grids are false because GSI did not plead this in Counts IV-VII.  GSI must plead its Consumer Fraud Act claim with particularity.  Fed. R. Civ. P. 9(b); Rockford Memorial Hosp. v. Havrilesko, 368 Ill.App.3d 115, 858 N.E.2d 56, 62 (Ill.App. 2nd Dist., 2006).[3]  GSI

---

[3]Whether the Lanham Act and the Uniform Act require pleading with particularity is unclear.  The Court can find no Illinois authority and no Seventh Circuit authority addressing whether the Uniform Act requires pleading with particularity.  The only federal opinion addressing the Illinois Uniform Act is an unpublished District Court opinion that indicates that pleading with particularity is not required.  Publications Intern., Ltd. v. Leapfrog Enterprises, Inc., 2002 WL 31426651, at *6 (N.D.Ill., 2002) (only notice pleading required).  The Court has not found a Seventh Circuit opinion addressing whether the Lanham Act requires pleading with particularity.  The Federal District Court opinions are conflicting.  See M & R Printing Equipment, Inc. v. Anatol Equipment Mfg., Co., 321 F.Supp.2d 949, 951 (N.D.Ill., 2004) (only notice pleading required); but see Conditioned Ocular Enhancement, Inc. v. Bonaventura, 458 F.Supp.2d 704, 709 (N.D.Ill., 2006) (pleading with particularity required).  The Court, however, need not decide the issue because, as explained infra, GSI may proceed with its claims even under the pleading standards of Rule 9(b).

pleaded in Counts IV-VII that Sukup committed unfair competition and deceptive business practices by copying GSI's data.  GSI did not allege that Sukup distributed false data about holding capacities.  <u>Third Amended Complaint</u>, ¶¶ 16-24.

Rule 9(b) requires pleading with particularity in order to provide the defendant with fair notice of the acts that are claimed to be unfair or deceptive.  <u>Samuels v. Wilder</u>, 871 F.2d 1346, 1350 (7th Cir. 1989).  The plaintiff, however, may proceed on unfair or deceptive acts omitted from the complaint if the plaintiff learns of the additional deceptive or unfair practices through discovery, and if the plaintiff provides adequate notice to the defendant that the plaintiff intends to proceed on this newly discovered information.  <u>Ash v. Wallenmeyer</u>, 879 F.2d 272, 274 (7th Cir. 1989); <u>Sundstrand Corp. v. Standard Kollsman Industries, Inc.</u>, 488 F.2d 807, 812 (7th Cir. 1973).

In this case, GSI's counsel announced in open court at the <u>Markman</u> hearing on August 2, 2006, that GSI had learned in discovery that Sukup copied the Zimmerman Grid and that GSI would be filing an amended complaint alleging unfair competition.  <u>Minute Entry entered August 2, 2006</u>.  On September 5, 2006, GSI filed a Motion for leave to file a second

amended complaint to add these counts.  <u>Motion for Leave to File Second</u> <u>Amended Complaint (d/e 95)</u>.  The Second Amended Complaint was filed on September 26, 2006.  <u>Second Amended Complaint (d/e 97)</u>.  GSI then filed the Third Amended Complaint on November 27, 2006.  <u>Third</u> <u>Amended Complaint</u>. On February 16, 2007, GSI supplemented its answers to interrogatories to notify Sukup that it planned to also assert that the holding and drying capacities in the Sukup Grids were false.  <u>GSI's Reply</u> <u>in Support of its Motion for Partial Summary Judgment as to GSI's Count</u> <u>IV for Sukup's Federal Deceptive Business Trade Practices (d/e 455) (d/e</u> <u>597)</u>, Exhibit A, <u>GSI's Supplemental Responses to Sukup Manufacturing</u> <u>Co.'s Third Set of Interrogatory Nos. 20-25 and 27-30 to the GSI Group,</u> <u>Inc.</u>, at 3.  GSI also supplied Sukup with expert Towne's supplemental report in March 2007.  <u>Sukup Unsealed Exhibits</u>, Exhibit 62, <u>Supplemental</u> <u>Report of Harmon L. Towne dated March 21, 2007</u>.  These responses in discovery gave Sukup sufficient notice of the additional basis for deceptive practices that GSI had developed in discovery.  GSI may proceed on the erroneous holding capacity representations in the Sukup Grids.

GSI argues that no issues of fact exist regarding the materiality of Sukup's false statements or the likelihood that GSI was injured by the

statements.  However, GSI relied on expert Morrison who opined based on his experience.  GSI also relied on anecdotal evidence.  Sukup provided its own competing experts who opined based on their experience. Sukup also provided its own anecdotal evidence.  This type of competing evidence creates an issue of fact.  GSI is not entitled to summary judgment on these issues.

Sukup also seeks summary judgment on GSI's claim in Count V under the Consumer Fraud Act.  To prevail on the Consumer Fraud Act, GSI must present evidence that: (1) Sukup engaged in a deceptive act or practice, (2) Sukup intended that a party (such as customers) rely on the deception, (3) Sukup committed the deceptive practice while engaging in trade or commerce in Illinois; and (4) GSI suffered damages proximately caused by the deception.  B. Sanfield, Inc., 168 F.3d at 970; Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill.2d 100, 180, 835 N.E.2d 801, 850 (Ill., 2005).[4] Unlike the Lanham Act, the Consumer Fraud Act requires evidence of actual

---

[4]Sukup asserts that the Consumer Fraud Act Count is also analyzed under elements of the Lanham Act.  Motion 453, at 24.  The Court disagrees.  The case relied on by Sukup involved a copyright violation.  Spex, Inc. v. Joy of Spex, Inc., 847 F.Supp. 567, 579 (N.D.Ill., 1994).  The Lanham Act analysis controlled in that case because the deceptive practice claim depended on whether the defendant's action was a copyright violation.  Id.  In other contexts, claims under the Consumer Fraud Act are not analyzed under Lanham Act principles.  E.g., B. Sanfield, Inc., 168 F.3d at 970-71.

damage.  <u>Avery</u>, 835 N.E.2d at 850.  In addition, because GSI is not a consumer, but a competitor, GSI must present evidence on the additional element that Sukup's deceptive practices were addressed to the market generally or otherwise implicated consumer protection concerns.  <u>Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.</u>, 190 Ill.App.3d 524, 534, 546 N.E.2d 33, 41 (Ill.App. 2nd Dist., 1989).  GSI is not required to present evidence that customers actually relied on the deceptive statement.  <u>B. Sanfield, Inc.</u>, 168 F.3d at 970. GSI is also not required to prove that Sukup intended to deceive consumers, only that Sukup intended that consumers rely on the representations.  <u>Rockford Memorial Hosp.</u>, 858 N.E.2d at 62.

GSI has failed to overcome Sukup's request for summary judgment on Count V.  The false statements in the Sukup Grids are evidence of a deceptive practice.  Sukup sales people distributed the false statements to customers as part of Sukup's marketing efforts.  This evidence supports an inference that Sukup intended that potential purchasers rely on the statements.  Sukup was engaged in trade or commerce in Illinois.  The false statements were directed at potential consumers and so implicated consumer protection concerns.  GSI, however, has failed to present any

evidence of injury.  GSI identifies no sale that it lost because of the Sukup Grids.  Without evidence of injury, GSI's Consumer Fraud Act claim fails. Sukup is entitled to summary judgment on Count V.

THEREFORE, the Motion for Summary Judgment by Defendant Sukup Manufacturing Company on Plaintiff's Unfair Competition Counts (d/e 453) is ALLOWED in part, and Plaintiff GSI Group, Inc.'s Motion for Partial Summary Judgment as to GSI's Count IV for Sukup's Federal Deceptive Trade Practices (d/e 455) is ALLOWED in part.  The Court enters partial summary judgment in favor of Sukup Manufacturing Company and against GSI Group, Inc. on Count V of the Third Amended Complaint, and further, enters partial summary judgment in favor of Sukup Manufacturing Company and against GSI Group, Inc., to the extent that GSI's monetary claims in Counts IV, VI, and VII are limited to disgorgement of profits.  The Court enters partial summary judgment in favor of GSI Group, Inc. and against Sukup Manufacturing Co. on Count IV of the Third Amended Complaint to the extent that the Court determines, pursuant to Rule 56(d)(1), that: (1) Sukup made literally false statements in its advertising materials for its tower dryers as set forth above, (2) GSI does not need to prove that the false statements were likely to

deceive potential customers because Sukup's statements were literally false,

and (3) Sukup used the false statements in its advertising to tout its tower

dryers in interstate commerce.  The two Motions are otherwise DENIED.

IT IS THEREFORE SO ORDERED.

ENTER:   October 28, 2008

      FOR THE COURT:

                        _____s/  Jeanne E. Scott_____
                                    JEANNE E. SCOTT
                            UNITED STATES DISTRICT JUDGE

APPENDIX A

# Z Tower Dryer Specifications...
## Unequalled

| Model | Z-1210 | Z-1512 | Z-1816 | Z-2018 | Z-2420 | Z-2521 | Z-3026 | Z-3531 | Z-4036 | Z-4742 | Z-5046 | Z-6055 | Z-7060 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drying CFM | 62,300 | 77,800 | 85,600 | 94,600 | 110,300 | 128,550 | 148,200 | 174,300 | 206,400 | 226,200 | 275,100 | 296,100 | 343,500 |
| Cooling CFM | 31,150 | 38,900 | 42,800 | 47,300 | 55,150 | 64,275 | 74,100 | 87,150 | 103,200 | 113,100 | 137,550 | 148,050 | 171,350 |
| Blower HP | 60 | 75 | 75 | 100 | 100 | 3-40 | 3-50 | 3-60 | 3-75 | 3-75 | 3-100 | 3-100 | 3-125 |
| Metering HP | 1 | 1 | 1 | 1 | 1 | 1-1/2 | 1-1/2 | 1-1/2 | 1-1/2 | 1-1/2 | 2 | 2 | 2 |
| Burner Capacity (BTU x 1000) | 13,457 | 16,805 | 18,490 | 20,434 | 23,825 | 27,767 | 32,011 | 37,649 | 44,582 | 48,859 | 59,422 | 63,958 | 74,196 |
| Average Heat (BTU x 1000) | 7,738 | 9,663 | 10,632 | 11,749 | 13,699 | 15,966 | 18,406 | 21,648 | 25,635 | 28,094 | 34,167 | 36,774 | 42,663 |
| Grain Column | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" |
| Tower Diameter | 12'-0" | 12'-0" | 12'-0" | 12'-0" | 12'-0" | 18'0" | 18'0" | 18'-0" | 18'-0" | 18'-0" | 24'-0" | 24'-0" | 24'-0" |
| Overall Height | 52'-4" | 59'-0" | 69'-0" | 75'-8" | 85'-8" | 66'-0" | 70'-0" | 86'-0" | 90'-0" | 100'-4" | 97'-10" | 107'-10" | 117'-10" |
| Heat Holding | 719 | 914 | 1,158 | 1,256 | 1,499 | 1,511 | 1,813 | 2,210 | 2,512 | 2,964 | 3,479 | 4,042 | 4,652 |
| Cool Holding | 305 | 305 | 354 | 451 | 500 | 529 | 680 | 737 | 888 | 1,038 | 1,126 | 1,177 | 1,381 |
| Total BU Holding | 1,427 | 1,622 | 1,915 | 2,110 | 2,401 | 2,977 | 3,430 | 3,883 | 4,337 | 4,939 | 6,244 | 6,908 | 7,522 |
| BU/HR 20% to 15 | 1,200 | 1,500 | 1,800 | 2,000 | 2,400 | 2,500 | 3,000 | 3,500 | 4,000 | 4,700 | 5,000 | 6,000 | 7,000 |
| BU/HR 25% to 15 | 720 | 900 | 1,080 | 1,200 | 1,440 | 1,500 | 1,800 | 2,100 | 2,400 | 2,820 | 3,000 | 3,600 | 4,200 |

* Overall height includes a 60" discharge height but does not include an inlet spout.

<u>GSI Opposition 513 Exhibit 2 (d/e 515)</u>, <u>Zimmerman Brochure</u>, at 6.

## APPENDIX B



**Sukup Manufacturing Company**
1555 255th Street, P.O. Box 677
Sheffield, IA USA 50475-0677

Ph: 641
Fax: 6
Website: www
Email: info@

**Sukup Tower Dryer Specifications**

| MODEL | Btu/hr 20% to 15 | Btu/hr 25% to 15 | Heat Holding Bushels | Cool Holding Bushels | Total BU Holding | Drying CFM | Cooling CFM | Motor Burner Capacity (BTU x 1000) | Average Heat (BTU x 1000) | Bottom Blower HP | Moisture HP | Grain Column | Tower Diameter | Overall Height |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U1212 | 1,200 | 720 | 807 | 264 | 1,085 | 62,300 | 31,150 | 13,457 | 7,738 | 60 | 1 | 12.75" | 12'-0" | 51'-4" |
| U1612 | 1,590 | 800 | 953 | 334 | 1,681 | 77,800 | 36,800 | 10,895 | 9,663 | 75 | 1 | 12.75" | 12'-0" | 55'-0" |
| U1812 | 1,800 | 1,068 | 1,170 | 410 | 1,874 | 85,800 | 42,600 | 18,490 | 10,632 | 75 | 1 | 12.75" | 12'-0" | 63'-0" |
| U2912 | 2,100 | 1,296 | 1,314 | 482 | 2,179 | 94,800 | 47,300 | 20,434 | 11,749 | 100 | 1 | 12.75" | 12'-0" | 79'-9" |
| U2412 | 2,400 | 1,440 | 1,520 | 536 | 2,458 | 110,300 | 55,150 | 23,825 | 13,090 | 100 | 1 | 12.75" | 12'-0" | 85'-8" |
| U2518 | 2,500 | 1,500 | 1,594 | 556 | 3,010 | 128,550 | 64,275 | 27,767 | 15,056 | 3-40 | 1-1/2 | 12.75" | 16'-0" | 56'-0" |
| U3018 | 3,600 | 1,880 | 1,920 | 675 | 3,465 | 148,200 | 74,100 | 32,011 | 18,406 | 3-50 | 1-1/2 | 12.75" | 16'-0" | 76'-0" |
| U3618 | 3,500 | 2,100 | 2,287 | 795 | 3,829 | 174,300 | 87,150 | 37,548 | 21,648 | 3-60 | 1-1/2 | 12.75" | 18'-0" | 86'-0" |
| U4818 | 4,800 | 2,400 | 2,590 | 910 | 4,572 | 208,400 | 103,200 | 44,982 | 25,525 | 3-75 | 1-1/2 | 12.75" | 18'-0" | 96'-0" |
| U4518 | 4,700 | 2,620 | 3,043 | 1,059 | 4,982 | 226,200 | 113,100 | 48,860 | 28,094 | 3-75 | 1-1/2 | 12.75" | 18'-0" | 102'-6" |
| U6024 | 6,000 | 3,000 | 4,090 | 1,160 | 6,669 | 275,100 | 137,550 | 59,472 | 34,167 | 3-100 | 2 | 12.75" | 24'-0" | 97'-10" |
| U6024 | 6,000 | 3,600 | 4,316 | 1,202 | 7,075 | 296,100 | 148,050 | 63,958 | 36,776 | 3-100 | 2 | 12.75" | 24'-0" | 107'-10" |
| U7024 | 7,000 | 4,200 | 4,571 | 1,408 | 7,486 | 343,500 | 171,750 | 74,196 | 42,663 | 3-125 | 2 | 12.75" | 24'-0" | 117'-10" |

* Dimensions are subject to change.

GSI Opposition 513 Exhibit 5 (d/e 516), Sukup Spec Sheet.

## APPENDIX C



**Sukup Tower Dryer Specifications**

| | U1212 | U1812 | U1812 | U2012 | U2412 | U2518 |
|---|---|---|---|---|---|---|
| Bu Hr .20% -.15%* | 1200 | 1500 | 1800 | 2000 | 2400 | 2500 |
| Bu Hr .25%-.15%* | 720 | 900 | 1080 | 1200 | 1440 | 1500 |
| Heat Holding Bu. | 807 | 954 | 1170 | 1314 | 1528 | 1584 |
| Cool Holding Bu. | 284 | 334 | 410 | 462 | 536 | 556 |
| Total Holding Bu. | 1485 | 1681 | 1974 | 2170 | 2458 | 3115 |
| Drying CFM | 62,300 | 77,880 | 85,800 | 94,680 | 110,300 | 129,550 |
| Cooling CFM | 31,150 | 38,900 | 42,800 | 47,340 | 55,150 | 64,275 |
| Maxon Burner Cap. (BTUx1000) | 13,457 | 16,905 | 18,490 | 20,444 | 23,825 | 26,767 |
| Ave. Heat (BTU/1000) | 7738 | 9683 | 10,632 | 11,740 | 13,699 | 15,399 |
| Barry Blower HP | 60 | 73 | 75 | 100 | 100 | 131.40 |
| AC Drive Metering HP | 1 ½ | 1 ½ | 1 ½ | 1 ½ | 1 ½ | 2 |
| Grain Column | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" |
| Tower Diameter | 12'0" | 12'0" | 12'0" | 12'0" | 12'0" | 18'0" |
| Overall Height | 56'4" | 63'0" | 71'0" | 77'8" | 87'8" | 59'0" |

| | U3018 | U3518 | U4018 | U4718 | U5024 | U6024 | U7024 |
|---|---|---|---|---|---|---|---|
| Bu Hr .20% -.15%* | 3000 | 3500 | 4000 | 4700 | 5000 | 6000 | 7000 |
| Bu Hr .25%-.15%* | 1800 | 2100 | 2400 | 2820 | 3000 | 3600 | 4200 |
| Heat Holding Bu. | 1920 | 2257 | 2590 | 3043 | 4060 | 4060 | 4571 |
| Cool Holding Bu. | 675 | 795 | 910 | 1060 | 1100 | 1202 | 1408 |
| Total Holding Bu. | 3485 | 3800 | 4372 | 4962 | 6660 | 7075 | 7480 |
| Drying CFM | 148,200 | 174,000 | 206,400 | 236,200 | 275,100 | 299,100 | 349,500 |
| Cooling CFM | 74,100 | 87,150 | 103,200 | 113,100 | 137,550 | 149,550 | 171,750 |
| Maxon Burner Cap. (BTUx1000) | 32,011 | 37,649 | 44,582 | 48,659 | 59,422 | 63,966 | 74,196 |
| Ave. Heat (BTU/1000) | 18,406 | 21,648 | 25,635 | 28,054 | 34,167 | 36,376 | 42,663 |
| Barry Blower HP | (3) 50 | (3) 60 | (3) 75 | (3) 75 | (3)100 | (3) 100 | (3)125 |
| AC Drive Metering HP | 2 | 2 | 2 | 2 | 3 | 3 | 3 |
| Grain Column | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" | 12.75" |
| Tower Diameter | 18'0" | 18'0" | 18'0" | 18'0" | 24'0" | 24'0" | 24'0" |
| Overall Height | 76'0" | 88'0" | 98'0" | 111'4" | 99'10" | 109'10" | 119'10" |

*BU/Hr (bushels per hour) listed are wet bushels, shelled corn at listed moisture content and are estimates based on drying principles, field results and computer simulation. Drying variances may occur due to grain kernal size, variety, maturity levels, excessive fines, adverse weather conditions, etc.

GSI Opposition 513 Exhibit 19 (d/e 518), Sukup Brochure, at 4.